**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

**ELECTRONICALLY FILED**

| | |
|---|---|
| GENERAL ELECTRIC COMPANY, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) CASE NO.: __3-13-cv-213-H__ |
| V. | ) |
| | ) DEMAND FOR JURY TRIAL |
| WHIRLPOOL CORPORATION | ) |
| SERVE: | ) |
|    CORPORATION SERVICE COMPANY | ) |
|    2711 CENTERVILLE RD., STE. 400 | ) |
|    WILMINGTON, DE  19808 | ) |
| | ) |
| | ) |
| WHIRLPOOL S.A. | ) |
| SERVE: | ) |
|    WHIRLPOOL S.A. | ) |
|    AV. DAS NACOES UNIDAS N., 12.995 | ) |
|    CEP 04578-000 SAO PAULO | ) |
|    BRAZIL | ) |
| | ) |
| | ) |
| EMBRACO NORTH AMERICA, INC. | ) |
| SERVE: | ) |
|    CORPORATION SYSTEM, INC. | ) |
|    2711 CENTERVILLE RD., STE. 400 | ) |
|    WILMINGTON, DE  19808 | ) |
| | ) |
| | ) |
| DANFOSS A/S | ) |
| SERVE: | ) |
|    DANFOSS A/S | ) |
|    NORDBORGVEJ 81 | ) |
|    6430 NORDBORG | ) |
|    DENMARK | ) |
| | ) |
| | ) |

DANFOSS FLENSBURG GmbH )
SERVE: )
   DANFOSS FLENSBURG GMBH )
   MADS-CLAUSEN-STR. 7 )
   24939 FLENSBURG )
   2439 SCHLESWIG-HOLSTEIN )
   GERMANY )
    )
    )
DANFOSS, LLC )
SERVE: )
   THE CORPORATION TRUST INC. )
   351 WEST CAMDEN STREET )
   BALTIMORE, MD 21201 )
    )
    )
HOUSEHOLD COMPRESSORS HOLDING SpA )
SERVE: )
   HOUSEHOLD COMPRESSORS HOLDING SpA )
   VIALE LINO ZANUSSI 11 )
   33170 PORDENONE )
   ITALY )
    )
    )
ACC USA, LLC )
SERVE: )
   THE CORPORATION TRUST COMPANY )
   CORPORATION TRUST CENTER )
   1209 ORANGE ST. )
   WILMINGTON, DE 19801 )
    )
    )
            DEFENDANTS. )

## COMPLAINT

**TABLE OF CONTENTS**

NATURE OF THE CASE ..................................................................................................1

JURISDICTION AND VENUE ........................................................................................2

PARTIES ..........................................................................................................................4

    Plaintiff ........................................................................................................................4

    The Embraco Defendants..............................................................................................5

    The Danfoss Defendants ...............................................................................................8

    The ACC Defendants..................................................................................................12

AGENTS AND CO-CONSPIRATORS ..........................................................................14

THE MABE PURCHASES .............................................................................................15

INTERSTATE AND IMPORT TRADE AND COMMERCE........................................19

DEFENDANTS' WRONGFUL CONDUCT ..................................................................20

    The Anticompetitive Customer Allocation Agreement ..................................................21

    The Anticompetitive Restriction on Technology Innovation .........................................24

    The Anticompetitive Restrictions on Capacity .............................................................28

    The Anticompetitive Price Stabilization and Inflation ..................................................30

INVESTIGATIONS AND PROCEEDINGS  RELATED TO THE CARTEL .........................39

THE STATUTES OF LIMITATIONS ...........................................................................42

FRAUDULENT CONCEALMENT................................................................................43

    Explicit Representations of Non-Collusion ..................................................................44

    Announcing Higher Price Increases Than the Actual Target Increases, as Agreed
        Upon by the Cartel .................................................................................................47

    False Representations of the Cause of Increased and Stabilized Prices .........................49

    The Cartel-Orchestrated Cover-Up Role of Tecumseh ..................................................60

    Embraco's False Assurance of No Cartel Harm to GE...................................................64

    The 2009 Embraco Price Negotiations .........................................................................65

    GE Did Not Know of the Cartel ...................................................................................68

    GE's Inquiry Notice of a Cartel ...................................................................................71

    GE's Constructive Notice of a Cartel ...........................................................................73

FIRST CAUSE OF ACTION ..........................................................................................74

    Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 .............................................74

i

SECOND CAUSE OF ACTION ............................................................................................76

    Fraud .............................................................................................................................76

THIRD CAUSE OF ACTION ...............................................................................................77

    Conspiracy .....................................................................................................................77

REQUEST FOR RELIEF .......................................................................................................78

JURY TRIAL DEMANDED ...................................................................................................79

Plaintiff General Electric Company hereby brings this action for damages and equitable relief under federal antitrust and state laws against Defendants, demanding trial by jury, and alleges as follows:

## NATURE OF THE CASE

1.      This lawsuit arises from a long-standing cartel created, maintained, and enforced by the Defendants and their co-conspirators (collectively, the "Conspirators") for anticompetitive acts and behavior.  They have agreed to, and in fact did, illegally inflate, raise, fix, and artificially stabilize the price of refrigerant compressors sold in the United States and elsewhere in the world.  The Defendants also have agreed to, and in fact did illegally, restrict capacity, restrict innovation, stabilize market shares, allocate customers, territories, and product types, and otherwise restrain competition in the manufacture and sale of refrigerant compressors in the United States and elsewhere in the world.  The result of the Conspirators' conduct has been to raise the prices paid by their customers, including Plaintiff, to supra-competitive levels, reducing the attractiveness of their customers' products in terms of price and quality, and thereby damaging their customers' businesses.  The cartel started at least as early as January 1, 1996 and the cartel and its effects will continue at least into 2013 (the "conspiracy period").  The exact dates of the conspiracy period are not known to Plaintiff, but are likely to be revealed during the course of discovery in this litigation.

2.      A refrigerant compressor, in the context of this case, is a device that compresses a refrigerant gas.  When the gas is later permitted to expand, it absorbs and thereby transfers heat, producing a cooling effect used in a wide variety of refrigeration products.  For example, refrigerant compressors are used in household refrigerators, in which the compressors are part of the system that creates cold air that keeps food fresh or frozen.

1

3.      During the conspiracy period, Defendants and their co-conspirators Tecumseh and Panasonic have dominated the global and U.S. markets for refrigerant compressors.  Indeed, the three largest suppliers to the U.S. market – Embraco, Panasonic, and Tecumseh – had as of 2008 a collective market share in the United States of approximately 85%.

4.      Plaintiff General Electric Company is one of the largest manufacturers and sellers of refrigeration equipment in the United States.  As such, it is one of the largest purchasers of refrigerant compressors in the United States.  Plaintiff General Electric Company has been a target and a victim of the Conspirators' cartel.  In particular, Plaintiff is one of the largest manufacturers of household refrigerators in the United States and globally, and throughout the conspiracy period, household refrigerators manufactured and/or sold by Plaintiff have included refrigerant compressors supplied by Conspirators.  As a result of the cartel, Plaintiff has paid supra-competitive prices for compressors and has been deprived of innovation that would have resulted in increased efficiency, as well as increased sales and profits, in its sales of refrigerators and other refrigeration equipment.

## JURISDICTION AND VENUE

5.      Plaintiff brings this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover damages, including treble damages, for the injuries sustained by Plaintiff resulting from violations by Defendants and their co-conspirators of Section 1 of the Sherman Act, 15 U.S.C. § 1.

6.      The Court has jurisdiction over the subject matter of this action pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331, 1332, 1337, and 1367.

7.      Defendants and their co-conspirators have engaged in conduct both inside and outside of the United States that was intended to and did have direct, substantial, and reasonably

2

foreseeable anticompetitive effects upon interstate commerce within the United States, and upon import trade and commerce with the United States.

8.      Venue is proper in the Western District of Kentucky pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. §§ 1391(b), (c), and (d), because a substantial part of the events giving rise to Plaintiff's claims have occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, have had agents in, or are found or transact business in this District.

9.      The Court has *in personam* jurisdiction over each of the Defendants because, among other things, each Defendant:  (a) transacted business in the United States, including in Kentucky; (b) directly or indirectly sold or marketed substantial quantities of refrigerant compressors throughout the United States, including in Kentucky; (c) had substantial aggregate contacts with the United States as a whole, including in Kentucky; or (d) was part of an illegal conspiracy to engage in cartel activity set forth above that was directed at, and was intended to have and did have a direct, substantial, and reasonably foreseeable effect of causing injury to the business or property of persons and entities residing in, located in, doing business in the United States, including in Kentucky.

10.     The activities of the Defendants and their co-conspirators have been within the flow of interstate commerce of the United States, and have been intended to, have had, and have a substantial effect on interstate commerce of the United States.

3

## PARTIES

**Plaintiff**

11.     Plaintiff General Electric Company ("GE") is a New York corporation with its principal place of business in Fairfield, Connecticut.  GE is a diversified company involved in many different businesses, including the appliance business.  The headquarters for GE's appliance business is in Louisville, Kentucky.

12.     During the conspiracy period, GE's appliance business has negotiated compressor supply relationships with and has purchased compressors from one or more Defendants and their co-conspirators for use in GE's production of refrigeration equipment, including household refrigerators.  GE has had four manufacturing plants during the conspiracy period that have used compressors supplied by one or more Defendants and their co-conspirators in the manufacture of refrigeration equipment.  The four plants have been located in Louisville, Kentucky; Decatur, Alabama; Bloomington, Indiana; and Selmer, Tennessee.  The Defendants and their co-conspirators have supplied compressors directly to each of GE's four plants.

13.     Prices and quantities of the compressors purchased by GE have been negotiated at GE's appliance business headquarters in Louisville, Kentucky.  Title to the compressors sold by Defendants and their co-conspirators to GE during the conspiracy period has passed from Defendants and their co-conspirators to GE in the states where GE's manufacturing plants have been located.  Payment for the compressors has been made by GE's appliance business headquarters in Louisville, Kentucky.  All compressors purchased from Defendants and their co-conspirators during the conspiracy period for GE's four refrigeration manufacturing plants have been purchased by GE directly from one or more Defendants and their co-conspirators.  Thus, during the conspiracy period, GE has purchased refrigerant compressors from one or more Defendants and their co-conspirators and has been injured in its business or property by reason

4

of the antitrust violations alleged in this Complaint.  Among other prayers for relief, GE seeks damages based on these direct purchases from the Defendants and their co-conspirators.

14.     As the largest U.S. purchaser of refrigerant compressors, GE has been a target and a victim of cartel activity in or affecting the United States; many times GE has been specified by name as a target of the Conspirators.

**The Embraco Defendants**

15.     Defendant Whirlpool Corporation ("Whirlpool Corp.") is a Delaware corporation with its principal place of business in Benton Harbor, Michigan.  Whirlpool Corp. is a manufacturer and marketer of home appliances.  During the conspiracy period, Whirlpool Corp. also has been actively involved in the manufacture and sale of refrigerant compressors through controlling ownership interests in the Brazilian companies Empresa Brasileria Compressors S.A. ("Embraco SA") and Multibrás S.A. Electrodomesticos ("Multibrás").  Embraco SA, a Brazilian company with its principal place of business in Joinville, Brazil, was engaged in the production and sale of refrigerant compressors.

16.     Defendant Whirlpool S.A. ("Whirlpool SA") is a wholly owned subsidiary of Whirlpool Corp.  Whirlpool SA is a Brazilian corporation with its principal place of business in Joinville, Brazil.  In April 2006, Whirlpool Corp. merged Embraco SA into Multibrás. Whirlpool Corp. changed the corporate name of Multibrás to Whirlpool SA.  Whirlpool SA has two business units:  one for home appliances and a second for the production and sale of refrigerant compressors.  The refrigerant compressor business unit is known and marketed as "Embraco."  The Embraco business unit comprises Whirlpool Corp.'s refrigerant compressor business.  The Embraco business unit employs approximately 10,000 people worldwide, including in sales offices in the United States.  Whirlpool SA, through its Embraco sales unit, holds itself out as the world's leading manufacturer of hermetic refrigerant compressors.

5

Whirlpool SA (including its predecessor Embraco SA), has sold refrigerant compressors since the 1970s, including selling refrigerant compressors in the United States and in this District during the conspiracy period.

17.     Defendant Whirlpool Corp. has dominated and controlled the finances, policies and affairs of Embraco SA and Whirlpool SA in relation to the antitrust violations alleged in this Complaint, or alternatively, Whirlpool Corp., Embraco SA, and Whirlpool SA have conspired with one another and the other co-conspirators jointly to engage in the cartel and injure and defraud GE.  For example, Paulo Periquito, an officer of both Whirlpool Corp. and Whirlpool SA, knew of and directed the implementation of the cartel by Embraco SA and Whirlpool SA. Mr. Periquito was also involved in meetings, discussions, and agreements with co-conspirators in furtherance of the cartel, including, for example, a June 23, 2006 meeting with Gerson Verissimo of Tecumseh at which Messrs. Periquito and Verissimo agreed to increase the market price of compressors to their respective customers.  Before becoming an officer of Whirlpool SA, Mr. Periquito had been President of Multibrás and Brasmotor S.A. ("Brasmotor") while at the same time he was an Executive Vice President of Whirlpool Corp.  Brasmotor was the holding company that owned Embraco SA.  Whirlpool Corp. owned a controlling interest in Brasmotor.

18.     Defendant Embraco North America, Inc. ("Embraco NA") is a wholly owned subsidiary of Whirlpool SA and formerly of Embraco SA.  Embraco NA is a Delaware corporation with its principal place of business in Suwanee, Georgia.  Embraco NA is responsible for, among other things, selling Embraco refrigerant compressors in North America, including the United States.  During the conspiracy period, Embraco NA has marketed and sold refrigerant compressors in the United States, including in this District.

6

19.      Throughout the conspiracy period, Defendants Whirlpool Corp. and Whirlpool SA (and before it, Embraco SA), have dominated and controlled the finances, policies, and affairs of Embraco NA, in relation to the antitrust violations alleged in this Complaint, or, in the alternative, Whirlpool Corp., Whirlpool SA, Embraco SA, and Embraco NA have conspired with one another and the other co-conspirators jointly to engage in the cartel and injure and defraud GE.  Defendant Whirlpool SA retains full ownership and asserts full control over Embraco NA and describes Defendant Embraco NA as its "sales office" responsible for the sale of Embraco products in the United States.

20.      Throughout the conspiracy period, Defendant Whirlpool SA also has dominated and controlled Embraco NA through personnel who served in management and board positions at Embraco NA.  During the conspiracy period, executives of Defendant Whirlpool SA simultaneously have held management positions within Embraco NA and controlled Embraco NA's day-to-day operations.  For example, during the conspiracy period, Ernesto Heinzelmann – one of the cartel ringleaders – served simultaneously as President of the Embraco division of Whirlpool SA and as President of Embraco NA.  This dual capacity ensured that the U.S. subsidiary toed the line in the implementation of the cartel.  Moreover, the following Whirlpool SA officers and directors also have held management positions at Embraco NA:  Gilberto Heinzelmann, Ingo Erhardt, Maysa Fischer, and Adriana Carvalho.  In addition, Defendant Whirlpool SA has dominated Embraco NA's board of directors throughout the conspiracy period.  For example, the following Whirlpool SA personnel have sat on Embraco NA's board of directors during the conspiracy period: Ernesto Heinzelmann, Ingo Erhardt, Gilberto Augusto Krause, Welson Teixeira, Laercio Hardt and Enrico Zito.  Indeed, for much of the conspiracy

7

period, the Embraco NA board has been composed entirely of Whirlpool SA officers, led by cartelist-in-chief Ernesto Heinzelmann.

21.     Defendants Whirlpool Corp., Whirlpool SA, Embraco SA, and Embraco NA are collectively referred to herein as "Embraco."

22.     Embraco has sold refrigerant compressors to GE in this District during the conspiracy period.  For example, Embraco supplied refrigerant compressors each year from 2002 through 2008 to GE's plant in Louisville, Kentucky.  Embraco shipped refrigerant compressors to Kentucky for storage in Louisville.  Title to those compressors passed from Embraco to GE in Kentucky when Embraco released the compressors from storage and delivered them to the GE plant in Louisville for use in the GE plant.  Payment for the refrigerant compressors was made to Embraco by GE's appliance division in Louisville, Kentucky.

23.     Officers and employees of Whirlpool SA and Embraco SA have traveled to and within the United States for the purpose of soliciting and doing business with GE with respect to the sale of refrigerant compressors and in furtherance of the implementation of the Conspirators' cartel.  For example, the following officers and employees of Whirlpool SA and Embraco SA have met with GE in the United States:  Evandro Francisco Gon, Roberto Campos, Laércio Hardt, Gilberto Heinzelmann, Ernesto Heinzelmann, Eduardo Lange, Eduardo Ortiga, Gustavo Haverroth, Eduardo Andrade, Reinaldo Maykot, Fabricio Possami, and Marcio Todescat.

**The Danfoss Defendants**

24.     Defendant Danfoss A/S ("Danfoss AS") is a privately-held Danish company with its principal place of business in Nordborg, Denmark.  Danfoss AS operates globally as a leading supplier of refrigerant products, including refrigerant compressors marketed and sold in the United States, including in this District.

25.     Danfoss AS markets itself as a global company that enters into business relationships with global customers based on the comprehensive utilization of the Danfoss global network.  Danfoss AS operates as a hands-on management company to control, among other things, the strategic direction, decision-making, and finances of its interrelated subsidiaries. Danfoss AS organizes its operations into what it refers to as the "Danfoss Group," which comprises the operation of Danfoss AS and its subsidiaries.  Throughout the conspiracy period the Danfoss Group has been, and is still today, organized into Divisions, each of which contains various Business Units, including Business Units involved in the production, marketing, and sale of refrigerant compressors.

26.     The Board of Directors of Danfoss AS determines (and throughout the conspiracy period has determined) the overall strategies and objectives for the entire Danfoss Group.  It also has defined guidelines for the Group's daily operations.  Today Danfoss AS has (and throughout the conspiracy period has had) a small group of executive officers (typically, three to five in number) known collectively as the Executive Committee.  The Executive Committee has had day-to-day responsibility for the operations of the entire Danfoss Group.  It has been assisted by Presidents of the various Danfoss Group Divisions and Business Units.  Today the management structure of the Danfoss Group is (and during part of the conspiracy period has been) embodied in what is known as the "Group Committee" of Danfoss AS.  This Group Committee is comprised of the members of the Executive Committee, the Divisional Presidents of Danfoss AS, and other executives of Danfoss AS.  The Group Committee leads and monitors the implementation of the Danfoss Group strategy.  Even before the existence of the Group Committee, the Divisional Presidents worked with the Executive Committee to manage the operations of the Group.  Throughout the conspiracy period, the Divisional Presidents directed

9

the operation of the Business Units of the Danfoss Group, including the Business Units involved in the production and sale of refrigerant compressors. The Divisional Presidents and Business Unit Presidents have been and are today officers of Danfoss AS.

27.     The Executive Committee also is (and throughout the conspiracy period has been) supported by a number of centralized corporate functions to assist its day-to-day management of the Group. These have included departments and personnel relating to communications and reputation, accounts and finance, legal, mergers and acquisitions, strategy and business development, and risk management. Danfoss AS operates (and throughout the conspiracy period has operated) a central financial department for the Group that handles overall monitoring and control of the entire Group's financial and operational risk management. This centralized control has been based on policies established by the Danfoss AS Board and Executive Committee.

28.     The Executive Committee and other officers of Danfoss AS have developed a Group-wide corporate program to improve and optimize daily operation of processes at all the Danfoss Business Units and increase growth and profitability of the Danfoss Group on a global basis. The Danfoss AS program, and the policies and practices arising therefrom, have encompassed and applied to all aspects of the Danfoss Group businesses, including sales, production, procurement, quality control, cost control, supply chain management, and innovation. The Danfoss AS program has been a sweeping Group-wide business plan imposed, implemented, and managed from the top by officers of Danfoss AS.

29.     The Divisions of the Danfoss Group operate (and during the conspiracy period, have operated) in a global and cross-organizational manner. Employees in one Business Unit have been used in other Business Units, Divisions, and functional areas. Group-wide teams have been assembled to address cross-organizational functions such as sales, marketing, production,

10

supply-chain management, and innovation.  Among other things, throughout the conspiracy period, the Danfoss Group Business Units involved in the production of refrigerant compressors have been supported by a Division-wide global sales and marketing organization that cut across many Danfoss Group Business Units.

30.     Defendant Danfoss Flensburg GmbH (formerly known as Danfoss Compressors GmbH) ("Danfoss Flensburg") is a wholly owned subsidiary of Danfoss AS.  Danfoss Flensburg is a corporation organized and existing under the laws of Germany with its principal place of business in Flensburg, Germany.  During the conspiracy period, Danfoss Flensburg has been a manufacturer of refrigerant compressors and engaged in the direct sale of refrigerant compressors to customers in the United States and elsewhere.  Throughout the conspiracy period, Defendant Danfoss AS has dominated and controlled the finances, policies, and other affairs of Danfoss Flensburg relating to the antitrust claims alleged in this Complaint, or, in the alternative, Danfoss AS and Danfoss Flensburg have conspired with one another and the other co-conspirators jointly to engage in the cartel and injure and defraud GE.

31.     Defendant Danfoss, LLC (formerly Danfoss, Inc.) ("Danfoss US") is a Delaware limited liability company with its principal place of business in Baltimore, Maryland.  Defendant Danfoss US is a wholly owned subsidiary of Defendant Danfoss AS.  During the conspiracy period, Danfoss US has marketed and sold refrigerant compressors in the United States, including this District.  Defendants Danfoss AS and Danfoss Flensburg have dominated and controlled the finances, policies, and other affairs of Danfoss US relating to the antitrust violations alleged in this Complaint, or in the alternative, Danfoss AS, Danfoss Flensburg, and Danfoss US have conspired with one another and the other co-conspirators jointly to engage in the cartel and injure and defraud GE.  During the conspiracy period, executives of Danfoss AS

11

have dominated Danfoss US's board of directors. For example, the following Danfoss AS officers have served on the board of Danfoss US: Jorgen Mads Clausen, Peter Hansen-Damm, Ole Steen Andersen, Henrik Clausen, Niels Bjorn Chistiansen, and Frederik Lotz.

32.    Defendants Danfoss AS, Danfoss Flensburg, and Danfoss US are collectively referred to herein as "Danfoss."

33.    Danfoss has sold refrigerant compressors to GE in this District during the conspiracy period. For example, Danfoss supplied refrigerant compressors each year from 1996 to 1998 to GE's plant in Louisville, Kentucky. Danfoss shipped refrigerant compressors to the GE plant in Louisville, Kentucky. Title to those compressors passed from Danfoss to GE in Kentucky when received by the GE plant in Louisville. Payment for the refrigerant compressors was made to Danfoss by GE's appliance business in Louisville, Kentucky.

34.    Officers and employees of Danfoss AS and Danfoss Flensburg have traveled to and within the United States for the purpose of soliciting and doing business with GE with respect to the sale of compressors. For example, the following officers and employees of Danfoss came from Europe to meet with GE in the United States:  Ole Kaarup Nielson, Peter Steensen, and Niels J. Josiasson.

**The ACC Defendants**

35.    Defendant Household Compressors Holding SpA (formerly known as Appliances Components Companies SpA) ("ACC SpA") is an Italian company with its principal place of business in Pordenone, Italy. During the conspiracy period, ACC SpA, directly and through its subsidiaries, has marketed and/or sold refrigerant compressors in the United States, including this District. ACC SpA manufactures its refrigerant compressors in Italy, Austria, and China.

36.    Throughout the conspiracy period, ACC SpA has engaged in hands-on management and control of its subsidiaries, marketing the parent and subsidiaries as a seamless

Group capable of satisfying diverse requirements of global customers.  Among other things, ACC SpA has performed centralized marketing and financial control for the Group, in order to plan and implement Group policies and processes worldwide at the various subsidiaries.  Sales and marketing representatives at SpA have been very involved in sales efforts of the Group. Bids for business, including those submitted to GE, have been formulated and approved by SpA personnel and sometimes have been submitted to customers like GE directly by ACC SpA employees.  For example, on October 26, 2004, Dino Turus of ACC SpA, a cartel ringleader, submitted on behalf of ACC SpA a bid for compressor refrigerant business to Tonya Williams of GE.

37.    Defendant ACC USA, LLC ("ACC USA") is a Delaware limited liability company with its principal place of business in Madison, Alabama.  ACC USA is wholly owned by Defendant ACC SpA.  During the conspiracy period, ACC USA has manufactured, marketed, and/or sold refrigerant compressors in the United States, including in this District.  ACC USA was formerly known as Americold Compressor Co. ("Americold") and owned and operated a compressor manufacturing plant located in Cullman, Alabama, during a portion of the conspiracy period.  Defendant ACC SpA has dominated and controlled the finances, policies, and affairs of ACC USA relating to the antitrust violations alleged in this Complaint, or, in the alternative, ACC SpA and ACC USA have conspired with each other and the other co-conspirators jointly to engage in the cartel and injure and defraud GE.

38.    Defendants ACC SpA, ACC USA, and Americold are collectively referred to herein as "ACC."

39.    ACC has sold compressors to GE during the conspiracy period.  For example, Americold supplied compressors each year from 1996 through 2002 to GE's plant in Decatur,

13

Alabama.  Title to the compressors passed from Americold to GE in Alabama at the time of delivery to GE in Alabama.  Payment for the refrigerant compressors was made to Americold by GE's appliance division in Louisville, Kentucky.

40.     Officers and employees of ACC SpA have traveled to and within the United States for the purpose of soliciting and doing business with GE with respect to the sale of compressors and in furtherance of the implementation of Defendants' cartel.  For example, the following officers and employees of ACC SpA have met with GE in the United States:  Lorenzo Pietromarchi, Giancarlo Poli, Alberto Casnati, and Josef Oskar.

## AGENTS AND CO-CONSPIRATORS

41.     Various other persons, firms, and corporations not named as defendants have participated as co-conspirators with the Defendants and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the associated anticompetitive conduct.  Each Conspirator acted as a principal or agent for the other Conspirators with respect to the acts, violations, and common course of conduct alleged by Plaintiff.

42.     The co-conspirators included at least: Tecumseh Products Company ("TPC"), Tecumseh do Brasil, Ltda. ("TdB"), and Tecumseh do Brasil USA, LLC ("TdB USA") (collectively, "Tecumseh"); and Panasonic Corporation (formerly known as Matsushita Electric Industrial Co., Ltd.) ("Panasonic Corp.") and Panasonic Corporation of North America ("Panasonic NA") (collectively, "Panasonic").

43.     During the conspiracy period, TPC has been a Michigan corporation with its principal place of business in Ann Arbor, Michigan.  TdB, a wholly owned subsidiary of TPC, has been during the conspiracy period a Brazilian corporation with its principal place of business in São Carlos, Brazil.  TdB USA, a wholly owned subsidiary of TdB, has been during the conspiracy period a Delaware limited liability company.  During the conspiracy period,

14

Tecumseh has manufactured, marketed, and sold refrigerant compressors in the United States and elsewhere.

44.     During the conspiracy period, Panasonic NA has been a Delaware corporation with its principal place of business in Secaucus, New Jersey.  Panasonic NA has been during the conspiracy period a wholly owned subsidiary of Panasonic Corp., a Japanese corporation with its principal place of business in Osaka, Japan.  During the conspiracy period, Panasonic has manufactured, marketed, and sold refrigerant compressors in the United States and elsewhere.

45.     Whenever this Complaint refers to any act, deed, or transaction of any corporation or limited liability entity, that allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the business or affairs of the corporation or limited liability entity.

## THE MABE PURCHASES

46.     Throughout the conspiracy period, GE has been a minority owner of a joint venture named Controladora Mabe, S.A. de C.V. ("MABE").  During the conspiracy period  (and today), GE has owned (and today owns) slightly more than a 48% interest in MABE.  GE also has minority representation on MABE's board of directors, and a veto right with respect to some categories of board decisions.

47.      As a part of its joint venture relationship with GE, during the conspiracy period, MABE has manufactured residential refrigerators for GE for sale in the United States pursuant to contract manufacturing agreements between GE and MABE (the "Contract Manufacturing Agreements").

48.     During the conspiracy period, GE's procurement teams in the United States have controlled and determined the price and quantity of refrigerant compressors MABE has

incorporated into refrigerators it has manufactured for sale by GE in the United States.  GE has drafted and issued all requests for quotation for refrigerant compressors to be purchased for incorporation into residential refrigerators manufactured by MABE for GE for sale in the United States; GE has reviewed responses to these requests for quotation; and GE has evaluated, qualified, and selected the compressor manufacturers that supplied those refrigerant compressors to MABE.

49. Throughout the conspiracy period, GE, on behalf of itself and MABE, routinely has held in-person negotiations with Defendants and their co-conspirators on the price and volume of refrigerant compressors that each of GE and MABE has purchased for incorporation into residential refrigerators manufactured for GE for sale in the United States.  GE and MABE have sat side-by-side during these negotiations.  The Defendants and their co-conspirators have been fully aware that the negotiations have been for refrigerant compressors that GE would purchase for inclusion in the refrigerators it manufactured itself for sale in the United States, as well as for the refrigerant compressors that MABE would purchase for inclusion in refrigerators it manufactured for GE for sale by GE in the United States.  One purpose of these joint negotiations has been to aggregate GE and MABE compressor purchase volume in an effort to increase GE's purchasing power.  As the Defendants and their co-conspirators have been fully aware, GE has directed and controlled these negotiations and has been the decision maker for the prices paid and volumes purchased by MABE for incorporation into refrigerators for GE to be sold by GE in the United States.  Defendants and their co-conspirators have been fully aware, and intended, that the refrigerant compressors they sold to MABE under the prices and terms negotiated by GE for MABE would be incorporated by MABE into refrigerators for sale by GE in the United States, as the Defendants and their co-conspirators meant to happen.

16

50.     GE, on behalf of itself and MABE, routinely has conducted these negotiations at the business headquarters of GE's appliance division in Louisville, Kentucky.  As part of these negotiations, GE has identified the types of refrigerant compressors that GE has required for the residential refrigerators it has manufactured, and that MABE has required for the residential refrigerators it has manufactured for GE for sale in the United States; GE, on behalf of itself and MABE, has negotiated the purchase prices that GE and MABE would pay; GE, on behalf of itself and MABE, has negotiated the quantities that GE and MABE would purchase; and GE, on behalf of itself and MABE, has negotiated other essential contract terms.  In person or by correspondence, GE has negotiated with Defendants and their co-conspirators until agreed-upon prices and other terms and conditions have been established for GE's purchases of refrigerant compressors and MABE's purchases of refrigerant compressors to be incorporated into refrigerators to be sold by GE in the United States.  Thus, GE has controlled the prices MABE paid for compressors purchased for incorporation into refrigerators to be sold by GE in the United States, as the Defendants and their co-conspirators have been fully aware and intended. By controlling the number of refrigerators purchased from MABE, GE also has controlled the quantity of the compressors purchased by MABE for incorporation into refrigerators to be sold by GE in the United States.

51.     During the conspiracy period, GE, MABE, and Embraco entered into a Product Sourcing Contract that has set forth the terms and conditions under which GE and MABE have purchased refrigerant compressors from Embraco.

52.     During the conspiracy period, GE, MABE, and Panasonic entered into a Letter Agreement that has set forth the terms and conditions under which GE and MABE have purchased refrigerant compressors from Panasonic.

17

53.     During the conspiracy period, GE has directed MABE's purchase of refrigerant compressors to be incorporated into residential refrigerators manufactured by MABE for GE for sale by GE in the United States, including negotiating the prices that MABE has paid to Defendants and their co-conspirators for these refrigerant compressors.

54.     From January 1, 2001, each year, GE has purchased residential refrigerators from MABE, as its contract manufacturer under the Contract Manufacturing Agreements, for sale by GE in the United States.  These refrigerators have been manufactured by MABE at its plant in Celaya, Mexico, and shipped to GE in the United States for sale by GE in the United States as GE-branded refrigerators.  In return for each refrigerator unit, GE has paid MABE for the total cost of the unit, plus a percentage mark-up over the total cost.  The Contract Manufacturing Agreements have been written so that MABE has passed on to GE the full direct material costs of acquiring a compressor and all other material costs associated with manufacturing refrigerators for GE to be sold by GE in the United States.

55.     During the conspiracy period, as a result of the Conspirators' illegal conduct, the price of refrigerant compressors sold to MABE for inclusion in GE-brand equipment have been fixed at supra-competitive levels.  MABE has incorporated these supra-competitively-priced refrigerant compressors into residential refrigerators that it manufactured for GE for sale by GE in the United States pursuant to the Contract Manufacturing Agreements, as the Defendants and co-conspirators knew and meant to happen.  The increase in the price of these refrigerant compressors has resulted in an increase in the price that GE has paid to MABE for residential refrigerators that GE has sold in the United States incorporating these refrigerant compressors because that price the GE has paid to MABE has been calculated on the basis of MABE's total material costs of the components of each refrigerator plus a percentage mark-up.

56.     During the conspiracy period, Defendants and their co-conspirators intentionally have directed and sent price-fixed refrigerant compressors to MABE, with full knowledge and intent that those refrigerant compressors have been intended to be, and would be, incorporated into residential refrigerators manufactured for GE and specifically destined for sale by GE in the United States.  Thus, the illegal price-fixing by the Defendants and their co-conspirators of the compressors they have sold to MABE has targeted and has been directed at import commerce. By illegally raising the prices of the compressors they sold to MABE, which they knew would be incorporated into the refrigerators manufactured by MABE for sale by GE in the United States, Defendants and their co-conspirators have meant to produce, and have produced, substantial effects on import commerce.  In addition, the effects of Defendants' and their co-conspirators' illegal acts on import commerce have been direct, substantial, and reasonably foreseeable. Among its prayers for relief, GE seeks damages based on the compressors sold by the Defendants and their co-conspirators to MABE whose ultimate destination has been for sale by GE in the United States.

## INTERSTATE AND IMPORT TRADE AND COMMERCE

57.     During the conspiracy period, the Defendants and their co-conspirators have been leading manufacturers and vendors of refrigerant compressors, globally and in the United States.

58.     During the conspiracy period, each Defendant and co-conspirator, or one or more of its subsidiaries, has sold refrigerant compressors throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

59.     Activities of Defendants and their co-conspirators, and their marketing and sale of refrigerant compressors, have taken place within the United States, and have been intended to have and have had, a direct, substantial, and reasonably foreseeable anti-competitive effect upon

interstate commerce within the United States and upon import commerce with foreign nations, as the Defendants and their co-conspirators have meant to happen.

60.     The Defendants' and co-conspirators' anticompetitive conspiracy and conduct described in this Complaint have directly and substantially affected interstate commerce in that Defendants and their co-conspirators have deprived Plaintiff of the benefits of free and open competition in the purchase of refrigerant compressors throughout the United States.

61.     Defendants' and their co-conspirators' illegal cartel agreements described in this Complaint (including, but not limited to, their agreements to inflate, fix, raise, maintain, or artificially stabilize prices of refrigerant compressors) and their overt acts in furtherance of those cartel agreements (including, but not limited to, their inflating, fixing, maintaining, or artificially stabilizing the prices of refrigerant compressors) have been intended to have and have had a direct, substantial, and reasonably foreseeable effect on United States commerce and on import trade and commerce with foreign nations, as the Defendants and their co-conspirators have meant to happen.

## DEFENDANTS' WRONGFUL CONDUCT

62.     Defendants' and their co-conspirators' cartel began at least as early as 1996.  In briefing the new CEO of Tecumseh (Ed Buker) in July 2008, Gerson Verissimo, one of the cartel ringleaders (acting on behalf of Tecumseh), explained to Mr. Buker that the cartel had been holding secret meetings among high level representatives of Tecumseh, Embraco, Danfoss, ACC, and Panasonic since 1996.  Mr. Verissimo also explained to Mr. Buker that while the meetings were illegal and forbidden under the laws of many countries, meeting and coordinating with the other Conspirators was good for Tecumseh's business, as the agreements reached at the cartel meetings enabled Tecumseh to increase sales prices and profits and avoid the loss of

market share.  Indeed, Mr. Verissimo warned Mr. Buker that failing to continue to participate in the cartel would jeopardize Tecumseh's business.

**The Anticompetitive Customer Allocation Agreement**

63.     GE operations in the United States have been directly impacted by the Conspirators' cartel.  GE is a high-volume purchaser of compressors that it uses to produce high-quality household refrigerators.  The two largest suppliers of compressors to GE during the conspiracy period have been Panasonic and Embraco.

64.     In the late 1990s, GE's principal supplier of compressors was Panasonic.  But GE believed that adding Embraco as a supplier would benefit GE by creating greater price competition, securing a greater and more diverse source of supply, and spurring Panasonic and Embraco to compete on quality and innovation, particularly in the creation of higher capacity, more energy-efficient compressors.  Accordingly, GE opened discussions with Embraco in 1998 about using Embraco as a supplier.  GE subsequently began the process of qualifying Embraco compressors – a sophisticated technology screening process, integral to GE's quality assurance mission – which was a necessary predicate to Embraco's becoming a supplier.  At the same time, GE informed Panasonic of its decision to qualify Embraco as a supplier and potentially to source compressors from Embraco.  GE also told Panasonic that Panasonic should improve the quality and efficiency of its compressors to or above the level of Embraco's compressors.  GE hoped that, faced with a competitive threat from Embraco, Panasonic would respond with competitive pricing and compressors that were more efficient and higher quality.

65.     GE's efforts to create competition were, however, thwarted:  unbeknownst to GE, Panasonic and Embraco had reached a secret agreement not to compete.  Thus, the prices and quality of the compressors that GE received from Panasonic did not reflect what GE would have received in a competitive market.  Instead, Panasonic, Embraco, and the other Conspirators had

21

agreed on a plan to allocate the GE business among themselves, so that they could avoid

competing with each other for GE's business on the basis of price, quality, efficiency, and

technology, that is, so they could avoid exactly the competitive market forces that GE was

working to accomplish in its supply chain.

66.     At times this agreement among Conspirators on allocation has been discussed and

policed in multi-lateral meetings; at other times it has been discussed and policed in bilateral

meetings or communications, which have included reports about communications with other

Conspirators, as well as in communications and reports among other Conspirators before and

after these bilateral meetings and communications.  For example, in June 2001, there was a

bilateral meeting among representatives of Embraco and Tecumseh at which Ingo Erhardt, Mike

Inhetvin, Valter Desidera, and others discussed communications among Embraco, Tecumseh,

and Panasonic.  The Embraco representatives (based on prior discussions with Panasonic)

confirmed for Tecumseh that Panasonic had agreed to discuss with Embraco the two companies'

respective planned communications with major customers prior to either Embraco or Panasonic

consummating supply agreements with those customers, including supply agreements with GE.

Embraco and Tecumseh confirmed that they too would follow the same approach of sharing with

each other and the other Conspirators information about planned supply agreements with their

major customers prior to consummating the agreements.

67.     This is how business has been done in the compressors industry among

Conspirators beginning at least as early as the mid-1990s:  close coordination among the

suppliers to ensure that they would cooperate, rather than compete, with each other.  The purpose

and effect of the cartel has been to avoid competing with each other:  to avoid competing on

price, to avoid competing for customers, to avoid competing on innovations and technology, to stabilize market shares, and to increase and stabilize prices.

68.    Embraco did eventually secure some of GE's business.  But this too was subject to an agreement among the Conspirators.  In particular, Panasonic and Embraco agreed that instead of competing with each other over how much of GE's business each could win, they would cooperatively share GE as a customer, limiting competition between them, by, among other things, allocating the supply of compressors to GE, limiting the volume of compressors each would allow GE to purchase, and agreeing not to compete on product innovation and technology.

69.    By limiting their respective supply to certain allocated amounts, Embraco and Panasonic have ensured that they would both be suppliers of GE because neither Panasonic nor Embraco would be willing to supply a sufficient number of compressors to GE to be a sole source of supply.  The other Conspirators have been aware of and have agreed to this market allocation.

70.    The Conspirators have met and communicated with each other to ensure no interference by other manufacturers with Panasonic's and Embraco's cooperative control over supply of compressors to GE.  For example, in May 2001, representatives of Embraco and Tecumseh met in Joinville, Brazil, in furtherance of the Conspirators' cartel.  Among other things, Ingo Erhardt and Mike Inhetvin of Embraco and Valter Desidera, Celso Furchi, and Jose Malagutti of Tecumseh discussed GE, including which suppliers were to do business with GE. Embraco soon successfully completed the qualification process and began supplying compressors to GE.  Tecumseh, on the other hand, started the qualification process three years later as a sham, spinning the process out over more than five further years, thereby fulfilling its

agreement not to compete for GE's compressor business, while pretending that it intended to compete.

**The Anticompetitive Restriction on Technology Innovation**

71.     GE is an industry leader in the development and sale of energy-efficient appliances, including energy-efficient residential refrigerators.  GE has long participated in Energy Star, a voluntary labeling program created by the U.S. Environmental Protection Agency to promote energy-efficient products.  Participation in Energy Star requires that GE's residential refrigerators not only meet, but exceed, federal minimum energy-efficiency standards set by the U.S. Department of Energy (the "DOE").

72.     On April 28, 1997, DOE amended then-existing federal minimum energy-efficiency standards for residential refrigerators, announcing more stringent minimum energy-efficiency standards to become effective on July 1, 2001.

73.     Following this announcement, and in order to meet and exceed these more rigorous energy-efficiency standards and thereby continue its participation in Energy Star, GE set out to secure a competitive supply of higher-efficiency compressors, including both high-efficiency variable speed and high-efficiency single-speed compressors, for use in its residential refrigerators.  GE recognized that Panasonic was capable of developing high-efficiency compressors needed to achieve the energy-efficiency that the Energy Star program demanded of residential refrigerators to entitle them to be labeled as meeting "Energy Star" performance; indeed, as GE knew, Panasonic was already manufacturing and selling high-efficiency, variable speed compressors in Asia.  GE also began identifying other manufacturers of high-efficiency compressors that would be able to compete with Panasonic on both price and technological innovation.  In particular, GE began qualifying Embraco with the intention of introducing a supplier to compete with Panasonic not only on price, but also on technology.

24

74.     The Conspirators knew of GE's effort to create and maintain healthy competition among its compressor suppliers.  Panasonic recognized that GE's qualification of Embraco would ultimately undermine its own high share of GE's business.  Unwilling to accept that it might face competition, Panasonic entered into a market allocation agreement with Embraco.  Specifically, Panasonic agreed not to sell high-efficiency compressors in the United States market and thereby to allocate the high-efficiency portion of the refrigerant compressor market to Embraco.  Embraco in turn agreed to price itself out of the low-efficiency portion of the refrigerant compressor market and thereby to allocate that portion of the market to Panasonic.

75.     Panasonic and Embraco have adhered to this agreement until at least 2011, thereby ensuring each a role in supplying GE while avoiding competing with each other.  High-efficiency compressors come in two types – single speed and variable speed.  Both types were the subject of the Conspirators' agreement to restrict technology innovation.  Only in 2011 did Panasonic offer a single speed high-efficiency compressor that was competitive with the Embraco model and that could be included in GE's 2012 production.  With respect to variable speed high-efficiency compressors, the anticompetitive effects of the Conspirators' agreement to restrict technology innovation is still impacting GE, as Embraco is the only available qualified supplier from which GE can source variable speed high-efficiency compressors today.

76.     On August 31, 2001, within months of the effective date of DOE's more stringent energy-efficiency standards, GE completed qualification of Embraco's compressors.  In an effort to stimulate increased competition in innovation and pricing for high-efficiency compressors, GE talked to Panasonic about Panasonic's developing its own high-efficiency compressors for the U.S. market.  But GE did not know that Panasonic and Embraco had agreed not to compete on product innovation.  Thus, while Panasonic assured GE that it was working on the development

of such a compressor – and in fact, as noted, already sold variable speed high-efficiency compressors in Asia – pursuant to its agreement with Embraco not to compete, Panasonic did not offer GE a high-efficiency compressor adapted for the U.S. market refrigerators until 2011, for sale in 2012, when it offered a higher-efficiency *single speed* compressor, as described further below.

77.     Further, despite Panasonic's claim to GE that it was working on developing a higher-efficiency *variable speed* compressor that it would offer in the United States, including to GE, GE did not see increased competition for such high-efficiency compressors from Panasonic or any other Conspirator.  Despite its continual representations and "assurances" to GE that it would further develop its variable speed compressor technology to offer higher-efficiency compressors in the United States, Panasonic did not, just as it had agreed with Embraco that it would not.  The result has been that throughout the conspiracy period, GE has not been able to purchase variable speed high-efficiency compressors from Panasonic, and was not able to purchase even single speed high-efficiency compressors from any supplier other than Embraco until last year.

78.     On April 28, 2008, the qualification standards for "Energy Star" labeling increased again, requiring that full-size refrigerators be 20 percent (up from 15 percent) more energy efficient than the newly increased DOE minimum energy-efficiency standards.  Despite the fact that these new Energy Star standards created yet another opportunity for the compressor manufacturers to compete on technology, the Conspirators continued their agreement not to compete.  Instead, Embraco maintained its role as the sole source of GE's supply of high-efficiency compressors needed to satisfy these increased energy-efficiency standards, under the ongoing conspiracy and agreement not to compete on technology.  As a result, GE continued to

26

pay a significant premium for these compressors over the prices GE would have paid in a competitive market.

79.     During the conspiracy period, Panasonic's claimed "development" of *variable* speed compressors for the U.S. market showed no meaningful progress.  In 2008 Panasonic offered GE a variable speed compressor for qualification testing, which in any event would mean the compressor would not be available for use in GE refrigerators for at least another twelve to eighteen months.  But, the compressor Panasonic offered for qualification testing was unsatisfactory; not only did it not exceed the efficiency of the Embraco compressors, it was not even on technological par with Embraco's compressors.  Only after three more years of repeated failures did the Panasonic compressor finally qualify as application-ready.  Panasonic's 2008 offer of an inferior model, and its repeated failures to pass qualification testing for those three more years, was – in retrospect – an elaborate sham designed to conceal the cartel by misleading GE into believing that Panasonic was attempting to compete on innovation and technology.  In fact, however, Panasonic's offer of an inferior variable speed compressor, and its repeated failures in qualification testing, were the result of its agreement with Embraco and the other Conspirators not to compete in the area of high-efficiency compressors.  The effects of Panasonic's failure to compete are still being felt today, as Embraco still remains the only available qualified supplier of variable speed high-efficiency compressors as of the date of this Complaint.  Thus, the effects of the cartel have extended at least into 2013.

80.     Likewise, Panasonic's development of a high-efficiency *single* speed compressor technology remained stagnant until May 2011 – more than a decade after Panasonic first claimed to GE that it was working to develop such a compressor – when Panasonic finally offered a substantially more efficient single speed compressor.  The energy-efficiency ratio of this

Panasonic compressor jumped – in a single step – from 6.8 to 7.3.  This leap was startling, tantamount to two generations of improvement in one fell swoop, but only after a decade of not competing with Embraco on efficiency.  Given the size of the technological jump, it is inconceivable that Panasonic had not been making incremental progress for many years, although in secret, and Panasonic never offered a reason why it could not have supplied higher-efficiency compressors years earlier.  The innovation in single speed compressors announced by Panasonic in 2011 did not become available for purchase by GE until 2012.  The delay was a result of the Conspirators' illegal agreement and actions in furtherance of their illegal agreement that Panasonic would not compete for higher-efficiency compressors.

81.    Thus, the effects of the Conspirators' anticompetitive agreement to restrict technology innovation has continued at least into 2013.

82.    During the conspiracy period, GE also has seen no competition in the low-efficiency portion of the refrigerant compressor market.  Embraco effectively has priced itself out of the low-efficiency portion of the refrigerant compressor market by offering GE low-efficiency compressors only at non-competitive prices, thus preserving Panasonic's role as GE's principal supplier of low-efficiency compressors, just as Embraco and Panasonic had agreed.

83.    The Conspirators thus have succeeded in their agreed purpose to allocate the supply of compressors to GE:  Panasonic has been the only qualified supplier from whom GE could obtain sufficient quantities of low-efficiency compressors, and Embraco has been the only qualified supplier from whom GE could obtain sufficient quantities of high-efficiency compressors.

**The Anticompetitive Restrictions on Capacity**

84.    The cartel scheme of the Defendants and their co-conspirators has included an agreement to restrict or reduce supply capacity in the marketplace, as a means of ensuring

28

stabilized and/or inflated prices.  There have been numerous meetings or discussions among the

Conspirators at which this agreement has been reached, confirmed, and policed by the

Conspirators.  For example:

- In March 2001, Mr. Eller of ACC and Bartolomeo Genta of Tecumseh exchanged information about planned production volumes and plant shutdowns.

- On May 30, 2001, Ingo Erhardt and Mike Inhetvin of Embraco met with Celso Furchi and Jose Malagutti of Tecumseh to, among other things, exchange information about planned production.

- On September 20, 2001, Embraco representatives Ingo Erhardt and Roberto Liemonitas met with Tecumseh representatives to confirm the details of the cartel agreement to decrease production capacity in coming years as an aid to boosting prices.  They further agreed to steps to take to implement this plan.

- On February 28, 2004, representatives of Danfoss and Tecumseh discussed the plan to withhold capacity from the market. Tecumseh confirmed that it was keeping secret from its customers that it had additional unused capacity available.

- In April 2004, Keishi Masuda of Panasonic and Ingo Erhardt of Embraco confirmed planned production volumes with one another in furtherance of their plan to restrict market capacity.  Following that agreement, Embraco relayed to Tecumseh Panasonic's information about Panasonic's production capacity plans.

85.     Pursuant to their illegal agreement, Defendants and their co-conspirators have

taken various steps to reduce capacity available to supply GE in the United States.  They have

done so even when demand for refrigerant compressors was increasing.  For example:

- On March 31, 2001, Tecumseh closed its Somerset, Kentucky plant.

- In April 2002, ACC closed its Cullman, Alabama plant, which had been a source of supply to GE.

- In March 2002, Panasonic closed its Venora, Tennessee manufacturing plant, which had been a source of supply to GE.

- In the latter half of 2003, Danfoss announced and implemented a reduction of capacity for household compressors in its plant in Monterrey, Mexico.

- In May 2004, Tecumseh announced and implemented the closing of its Michigan compressor assembly operations.

- In 2004, Danfoss announced, and subsequently implemented, the planned reduction of household compressor production at its Flensburg, Germany plant.

86.     In addition to closing plants and production lines, the Conspirators also secretly have withheld supply from the market pursuant to their cartel agreement. The Conspirators have withheld information about capacity from customers, and affirmatively have misrepresented capacity to customers, as they have agreed to do.

87.     Both reducing production capacity and withholding information about capacity supported and reinforced the Conspirators' ability to impose their illegally agreed prices on their customers, including GE. The Conspirators' restriction of supply capacity has had the effect of driving up GE's costs for compressors and artificially depriving GE of available choice in the marketplace, as the Conspirators have intended.

**The Anticompetitive Price Stabilization and Inflation**

88.     In addition to effectively increasing prices by restricting supply, allocating customers, and agreeing not to compete on product innovation, Defendants and their co-conspirators also have agreed to directly stabilize and raise prices, and they have implemented those agreements in their pricing to customers, including GE, thus causing GE to pay supra-competitive prices for compressors. As the largest U.S. purchaser of refrigerant compressors, GE has been both a target and a victim of cartel activity in or affecting the United States; many times GE has been specified by name as a target in discussions and other communications between and among the Conspirators.

89.     For example, in January 2004, Ingo Erhardt of Embraco contacted Keishi Masuda of Panasonic to invite him to discuss how to successfully charge higher prices to customers. This communication led to a bilateral meeting on April 13, 2004, at Blue Tree Towers Hotel in Joinville, Brazil.  At the meeting, Embraco suggested that the companies announce an 8-9% increase in price, with an actual target of a 7% increase in the U.S. market.  Panasonic agreed to implement the plan.

90.     Also in furtherance of the cartel, on March 17, 2004, representatives from Embraco and Tecumseh met together at Embraco's headquarters in Joinville, Brazil.  Attendees included Gerson Verissimo, Jose Furci, and Januário Soligon from Tecumseh and Ernesto Heinzelmann, Ingo Erhardt, and possibly others from Embraco.  They discussed supply and demand for compressors in various world regions, including the United States, as well as the need for price increases.  The attendees agreed to announce compressor price increases of 8-10% in June 2004 throughout the world, including in the United States, with a goal of achieving at least a 6% increase.  This pricing agreement, like others throughout the conspiracy period, involved agreement on the percentage change in price that the Conspirators would announce to customers, as well as agreement on the minimum that they agreed to accept.

91.     In keeping with the March 17 and April 13, 2004 agreements, Embraco announced a 9% price increase to GE in the spring of 2004, but eventually settled on a "negotiated" increase that was slightly lower.  In a letter to GE dated April 24, 2004, Embraco, claiming to be "transparent" in its relationship with GE, told GE that the price increase was caused by rising material costs, that is, a cause beyond Embraco's control.  Embraco followed up with a presentation to GE on August 4, 2004.  The presentation contained charts showing rising raw materials costs, and Embraco sought to convince GE that these costs were to blame for the

compressor price increase, when in fact Embraco increased prices pursuant to the agreement among the Conspirators.

92.     Similarly, in the spring of 2004, Panasonic announced a 7% price increase to GE. Panasonic then "negotiated" a price increase to GE that represented a slightly lower price increase than was originally announced, thus creating the false appearance of price negotiation.

93.     Other Conspirators who were not present at the March 17 or April 13 meetings agreed in subsequent bilateral communications to implement the cartel price increases agreed to at the meetings. In April 2004, Gerson Verissimo of Tecumseh confirmed with representatives of ACC, Danfoss, and Embraco that ACC, Danfoss, and Embraco would announce price increases of at least 8-9%, effective June 1, 2004. He also received confirmation from Embraco that Panasonic would implement price increases. Bartolomeo Genta of Tecumseh spoke with Tecumseh's competitors and co-conspirators, including Mr. Eller at ACC and Ernesto Jillio at Danfoss, to ensure that the agreement from the March 17 meeting had been accepted by ACC and Danfoss. Mr. Genta received confirmation from them that Danfoss was announcing 8% increases and hoping to get 4%, and that ACC was announcing 6-8% increases to its large clients and 12% to its smaller clients.

94.     Discussions among the Conspirators concerning this round of agreed price increases continued into May 2004 and also included agreements about capacity. On May 5, 2004, Gerson Verissimo had several long telephone conversations with Ernesto Heinzelmann of Embraco, Lars Snitkjaer of Danfoss, and Valter Taranzano of ACC, in which he provided an aggressive tutorial on how to convince the cartel's customers that commodity price increases were causing compressor prices to go up. ACC, Danfoss, and Embraco agreed to increase prices by at least 8-9%, effective June 1, 2004, or in some cases, effective July 1, 2004. Additionally,

the Conspirators agreed to restrict their capacity and provided mutual assurance that they would

not steal market share from each other, even if it meant having excess capacity.

95.     Cartel members regularly have policed the conspiracy.  For example, on May 10,

2004, Gerson Verissimo of Tecumseh instructed Tecumseh employees Bartolomeo Genta and

Michel Jorge Geraissate, among others, to contact ACC, Danfoss, and Embraco to confirm that

these companies were telling potential customers that they had no available capacity.  Mr.

Verissimo explained that the uniform approach to capacity restriction was vital to the success of

the Conspirators' agreement to raise prices.  Messrs. Genta and Geraissate did as instructed and

received the requested confirmation from ACC, Danfoss, and Embraco.

96.     In addition to these phone calls, Tecumseh employees also have arranged "check-

in" meetings with the other Conspirators.  For example, in May 2004, Tecumseh employees

Anuj Pattanaik and Harendra Kumar met with Masatoshi Ando, Benny Poh, Venit Kumar

Mathur and Mr. Koshikizawa of Panasonic at Rang Mahal Indian restaurant in Singapore.  At

that meeting, the parties discussed capacity, and reaffirmed their shared goal of raising prices in

North America by double digits.

97.     Following the coordinated price increases earlier in 2004, the Conspirators

decided to meet again to raise prices further.  To avoid arousing suspicion, they scheduled a

cartel meeting at the time of a trade fair known as IKK, being held in Nuremberg, Germany,

from October 13-15, 2004.  The Conspirators selected that event because it was one that

household refrigerator manufacturers like GE would not attend, so there would be less chance of

the cartel being discovered by its victims.

98.     The Conspirators met at the Victoria Hotel in Nuremberg on October 14.  Danfoss

selected the site and co-hosted the meeting with Embraco.  Once again focused on not arousing

suspicion, the Conspirators booked a meeting room under the fictitious name "International

Compressor Association (ICA)."  The Conspirators' representatives all arrived separately

throughout the morning.  A Danfoss representative greeted them in the lobby.  The attendees

included, among others, Valter Taranzano, Dino Turus, and Jordi Riu from ACC; Lars Snitkjaer

and Jorn Westermann from Danfoss; Ernesto Heinzelmann, Gilberto Heinzelmann, and Laercio

Hardt from Embraco; Keishi Masuda from Panasonic; and Gerson Verissimo, Jean-Marc Sassier,

and Bartolomeo Genta from Tecumseh.

99.     The attendees exchanged information about capacity, production levels (current

and planned), and pricing.  Danfoss confirmed that it had shut down its compressor plant in

Mexico.  Everyone agreed that:  (1) the companies would increase prices by "double digits"; (2)

they would increase prices soon to avoid the possibility of losing the false cover of increased raw

material costs (in case the raw material costs might decrease in the future); (3) the companies

would not accept lower price increases in return for the right to provide additional volume to

their customers – that is, no Conspirator would agree to increase its share of a customer's supply

in return for competing on price; and (4) the companies would not guarantee to their customers

that prices would remain constant – would not be further increased – during the remainder of the

2005 calendar year, even where the cartel members had executed contracts that included a

binding commitment that the contract prices would remain in effect throughout the contract term.

100.     The Conspirators also discussed the opportunity for a further price increase based

on demand exceeding supply.  This opportunity arose from their collective and coordinated

efforts over the years to reduce capacity.

101.    On December 3, 2004, Panasonic implemented the cartel agreement by notifying GE that it planned to increase prices effective April 1, 2005, by 11%.  Around the same time, Embraco announced a 12% increase.

102.    Cartel meetings continued.  For example, Gerson Verissimo of Tecumseh, Ernesto Heinzelmann and Dailson Faria of Embraco, and Paulo Periquito of Whirlpool Corp. met at Embraco's headquarters in Joinville, Brazil, on September 1, 2005.  They discussed the desirability of the industry's raising compressor prices for 2006.  Mr. Periquito instructed his subordinates to coordinate a price increase with the other Conspirators.

103.    Shortly after the meeting at Embraco's headquarters, the Conspirators met again under the invented fictitious "ICA" name, this time at the Sheraton Frankfurt Hotel & Towers Conference Center in Frankfurt, Germany, on September 26, 2005.  Attendees included at least Gilberto Heinzelmann and Laercio Hardt from Embraco, Bartolomeo Genta and Michel Jorge Geraissate from Tecumseh, Dino Turus from ACC, and Lars Snitkjaer from Danfoss.  Keishi Masuda of Panasonic was invited, but did not attend; his boss, Naoki Adachi, deemed it "too dangerous" because of his belief – incorrect, as it turned out – that it would be difficult to keep secret a pricing conversation among so many competitors.   Instead, Panasonic chose to continue as an integral part of the cartel, but by participating in a way it thought was less risky, namely through a series of bilateral communications with the Conspirators who had attended, following up on the agreement forged at the September 26, 2005 meeting.

104.    During the September 26, 2005 meeting, the Conspirators exchanged information on pricing, planned sales, capacity, planned production, and pricing negotiations with customers. The Conspirators agreed that at a minimum prices should be stabilized at their current levels, that prices should be further increased when possible, and that if the volumes each Conspirator was

supplying a customer were reduced by the customer, the Conspirators would raise prices to that customer.  This last part of their agreement demonstrated, once again, how successful the Conspirators were at eliminating competition and at coordinating behavior contrary to competition:  just as they had earlier agreed that they would not reduce prices to win share from each other, they now agreed that if a customer reduced purchases from any of them, they would *increase* prices in response.  The Conspirators agreed to keep one another apprised of their negotiations with customers before finalizing agreements with those customers, and to coordinate with one another to avoid price competition.  The Conspirators agreed to more frequent bilateral contacts to keep one another informed.  They also agreed that it was essential to keep their contacts and discussions secret to avoid detection of the cartel.

105.    The Conspirators maintained contact following the September 26, 2005 meeting to ensure adherence to the agreement reached at the meeting.  For example, Gerson Verissimo of Tecumseh called Laercio Hardt and Ernesto Heinzelmann of Embraco at least nine times between December 15, 2005, and April 24, 2006, to discuss the cartel agreement.

106.    On May 15, 2006, Ernesto Heinzelmann of Embraco notified GE that Embraco planned to increase prices on July 1, 2006, claiming the increase was caused by rising materials costs.

107.    Around this same time, Laercio Hardt and Ernesto Heinzelmann also had telephone conversations and an in-person meeting with Panasonic employees Hideo Kagita and Maoki Adachi.  The in-person meeting took place on May 19, 2006, at the Renaissance Hotel in Tokyo, Japan.  Messrs. Hardt and Heinzelmann attended on behalf of Embraco, and Messrs. Kagita and Adachi attended on behalf of Panasonic.  At the meeting, the employees of Embraco and Panasonic discussed demand, rising materials costs, and their plans for double-digit

price increases in North America.  Embraco conveyed information to Panasonic about Tecumseh's plans, and Embraco and Panasonic assured one another that they would seek price increases.

108.   On May 23, 2006, Embraco met with GE to implement the price increase the Conspirators had planned.  Embraco claimed that rising copper prices were the cause of the price increases and announced that it would raise prices between 11 and 14%.  GE "negotiated" the price increase down toward the lower end of this range.

109.   One week later, Panasonic announced a similar price increase of 14.3% during a visit to GE on May 30, 2006.  Panasonic claimed that rising costs for raw materials caused the price increase.   In July, Panasonic "negotiated" with GE to accept a slightly lower price increase.

110.   In June 2006, Gerson Verissimo of Tecumseh dined with Valter Taranzano of ACC at the Palace Hotel in Milan, Italy.  The two shared detailed information about customers and planned pricing.  Also in June 2006, Laercio Hardt of Embraco conferred with Hideo Kagita of Panasonic to discuss customer reactions to the price increases the companies had announced to their customers the month before.

111.   Discussions between Embraco and Panasonic continued into the Fall of 2006.  On September 26, 2006, Laercio Hardt and Gilberto Heinzelmann represented Embraco at a meeting with Hideo Kagita and Maoki Adachi of Panasonic.  The meeting took place at the Kempinski Hotel in Beijing, China.  They agreed on further price increases in North America.  Following the meeting, the attendees continued their discussions via email, but hid the true illegal purpose of those communications by using in the subject line of the emails the misleading and false phrase "Embraco's China Factory" as a code for price-fixing communications.

112.    In October 2006, there was a further meeting of Conspirators in Nuremburg, Germany.  They agreed to seek increases in 2007 prices and to coordinate with each other in their efforts to do so.

113.    In mid-November 2006, Embraco and Panasonic held yet another "check-in" – *i.e.*, policing – meeting at a Japanese restaurant in Shanghai.  Laercio Hardt and Gilberto Heinzelmann attended on behalf of Embraco, and Maoki Adachi and Hideo Kagita attended for Panasonic.  They discussed pricing and agreed to stay in touch.   On November 17, Embraco finalized its price increase to GE for 2007.  Three days later, Panasonic finalized its increase to GE for 2007.

114.    On March 20, 2007, Panasonic and Embraco held another bilateral meeting in Beijing, China.  Laercio Hardt of Embraco initiated the meeting with Hideo Kagita of Panasonic, using the pretextual and false topic of "carbon dioxide emissions" as a code to hide the real illegal purpose of the meeting:  a "check-in" – policing – on the recently implemented price increases.  The frequent policing "check-ins" among the Conspirators enabled Embraco and Panasonic to remain confident that they could stand firm on their announced price increases without risk of being undercut by other cartel members, notwithstanding the possibility that falling copper prices might undermine their pretextual justification for the increase.

115.    In the fall of 2008, the Conspirators met again and agreed to implement further price increases.  They agreed to announce price increases of around 10% with the expectation of getting 6-9%.  Tecumseh did not attend the meeting, but afterward John Lang of Embraco relayed the agreement to Claude Falchier of Tecumseh.  In accordance with these discussions, Embraco had already announced a 10% price increase to GE, which GE had "negotiated" down slightly.

## INVESTIGATIONS AND PROCEEDINGS
## RELATED TO THE CARTEL

116.    The Antitrust Division of the U.S. Department of Justice ("DOJ") offers "leniency" under its "amnesty program" – including immunity from criminal prosecution – to corporations self-reporting their illegal antitrust activity at an early stage of a DOJ investigation, if they meet certain conditions.  Under this policy, an applicant for leniency must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will receive a conditional leniency letter.

117.    On February 12, 2009, the DOJ granted Tecumseh conditional leniency pursuant to this Antitrust Division Corporate Leniency Policy.  Thus, sometime not long before this date, in order to obtain leniency under the amnesty program, Tecumseh had disclosed to the DOJ the existence of a criminal cartel and Tecumseh's participation in it.  Tecumseh issued a press release on February 25, 2009, announcing the existence of the amnesty agreement with the DOJ. Tecumseh's press release did not disclose the type of compressors that were the subject of the agreement or of the DOJ investigation.

118.    On February 17, 2009, the European Commission ( "EC") and the Secretariat of Economic Law of the Ministry of Justice of Brazil ( "SDE") launched surprise inspections of certain compressor manufacturers.  The EC raids targeted at least Whirlpool Corp. and Danfoss. The SDE raids targeted at least Whirlpool SA, TdB, Paulo Periquito of Whirlpool Corp., and Gerson Verissimo, formerly of TdB.  Also on February 17, 2009, the DOJ issued grand jury subpoenas, including one to Whirlpool Corp., and conducted inspections of  Danfoss facilities in the United States.

119.    On February 18, 2009, the EC and SDE issued press releases announcing their surprise inspections of February 17, 2009.  On February 19, 2009, the DOJ announced publicly that its Antitrust Division was investigating the possibility of anticompetitive practices in the compressor industry.

120.    On February 25, 2009, civil complaints were filed on behalf of a putative class of direct purchasers of refrigerant compressors in the United States.  The complaints alleged an illegal cartel among compressor manufacturers, including Defendants.  As a direct purchaser of refrigerant compressors in the United States, GE was a member of the putative class.

121.    On June 9, 2009, the Judicial Panel on Multidistrict Litigation entered an order directing the transfer of putative class actions relating to the refrigerant compressor cartel to the U.S. District Court for the Eastern District of Michigan for consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 as MDL No. 2042.

122.    On June 30, 2010, a consolidated Master Amended Complaint ("MAC") was filed in MDL No. 2042 on behalf of a putative class of direct purchasers of refrigerant compressors in the United States.  The MAC included as parties Defendants named herein.

123.    On August 30, 2010, certain of the defendants in MDL No. 2042 moved to dismiss the MAC filed by the putative direct purchaser class plaintiffs.

124.    On September 30, 2010, Panasonic Corp. and Embraco NA pled guilty to conspiring with their competitors to raise prices in criminal violation of the U.S. antitrust laws in connection with the sale of household refrigerant compressors in the United States from October 14, 2004 through December 31, 2007.  Judgment was entered against Panasonic Corp. on November 23, 2010, and against Embraco NA on January 6, 2011.

125.    On June 13, 2011, the Court in MDL No. 2042 granted in part and denied in part the defendants' motion to dismiss the MAC filed by the direct purchaser class action plaintiffs.

126.    On August 23, 2011, a First Amended Master Amended Complaint ("FAC") was filed in MDL No. 2042 on behalf of the putative class of direct purchasers. On September 27, 2011, the direct purchaser class plaintiffs sought leave to file a Second Amended Master Amended Complaint ("SAC").

127.    On September 27, 2011, a federal grand jury returned an indictment against three former executives from Whirlpool SA, TdB, and Panasonic Corp. The indicted individuals are Ernesto Heinzelmann, former president and chief executive officer of Whirlpool SA, Gerson Verissimo, former president of TdB, and Naoki Adachi, former general manager of global sales and SE group, refrigeration devices at Panasonic Corp. The three executives are charged with criminal violations of Section 1 of the Sherman Act in connection with a conspiracy to suppress and eliminate competition by coordinating price increases for refrigerant compressors to customers in the United States and elsewhere. Messrs. Heinzelmann and Verissimo are charged with participating in the conspiracy from at least as early as October 14, 2004, until on or about December 31, 2007. Mr. Adachi is charged with participation in the conspiracy from at least as early as May 10, 2006, until on or about December 31, 2007. The criminal proceeding against the three individuals is still pending.

128.    On October 4, 2011, Danfoss Flensburg pled guilty to criminal violation of Section 1 of the Sherman Act in connection with its participation in a conspiracy to suppress and eliminate competition by fixing prices to customers of light commercial compressors sold in the United States and elsewhere, from October 14, 2004 through September 6, 2007. Judgment was entered against Danfoss Flensburg on December 19, 2011.

129.    On June 7, 2012, the Court in MDL No. 2042 granted in part and denied in part the direct purchaser class plaintiffs' motion for leave to file an SAC.  On June 20, 2012, the direct purchaser class plaintiffs filed an SAC.

## THE STATUTES OF LIMITATIONS

130.    This Complaint is timely filed.  Overt acts in furtherance of the cartel and fraud that injured GE have occurred within the applicable limitations periods, and this Complaint is filed within those periods.  In addition, the statutes of limitations applicable to GE's complaint are tolled at least to the date this Complaint was filed, for at least three reasons.

131.    First, the limitations periods are tolled by the filing of the first direct purchaser class action complaint on February 25, 2009 under the doctrine enunciated by the Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).

132.    Second, the limitations periods are tolled under Section 5(b) of the Clayton Act, 15 U.S.C. § 16(i), which provides that "whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter."

133.    Tolling under Section 5(b) began on September 30, 2010, when the DOJ initiated criminal proceedings against Panasonic Corp. and Embraco NA.  Those criminal proceedings terminated on November 23, 2010 and January 6, 2011, respectively.  Accordingly, absent the filing of any further related criminal proceedings, the limitations period was extended until January 6, 2012.

134.    On September 27, 2011, the DOJ initiated related criminal proceedings against Messrs. Verissimo, Ernesto Heinzelmann, and Adachi.  As this criminal proceeding was filed

prior to January 6, 2012, it had the effect of extending the already-existing tolling period under Section 5(b).  The criminal proceeding against Messrs. Verissimo, Ernesto Heinzelmann, and Adachi is still pending and hence the tolling period under Section 5(b) has not concluded.

135.    On October 4, 2011, the DOJ commenced related criminal proceedings against Danfoss Flensburg, which were terminated December 19, 2011.  Absent the filing of another related criminal proceeding, the limitations period was extended under Section 5(b) until December 19, 2012.  However, because of the pending criminal proceeding against Messrs. Verissimo, Ernesto Heinzelmann, and Adachi, the tolling period under Section 5(b) did not conclude on December 19, 2012, and to the date of filing of this Complaint has not concluded.

136.    Third, the limitations periods are tolled under the doctrine of fraudulent concealment.  Because of the fraudulent conduct of the Defendants, GE could not have discovered its cause of action earlier than the end of February 2012.  Detailed allegations supporting the application of the doctrine of fraudulent concealment are set forth below.

## FRAUDULENT CONCEALMENT

137.    Defendants and their co-conspirators affirmatively and fraudulently have concealed from Plaintiff the existence of the unlawful contract, combination, and conspiracy alleged herein.  As a result of fraudulent concealment of the cartel by Defendants and their co-conspirators, the running of any statute of limitations has been equitably tolled from at least January 1996 with respect to Plaintiff's claims arising from the anticompetitive conduct alleged in this Complaint.

138.    Defendants have conspired to commit, and committed, acts of fraud and deceit separate from their illegal conspiracy to fix, maintain and stabilize prices, allocate customers and markets, restrict capacity and technology innovation, and otherwise restrain competition, in order to hide and conceal their illegal conduct and avoid detection by their victims.  These acts of fraud

43

and deceit, described above and in the following paragraphs, have included, but have not been limited to, secret meetings and conversations concerning price increases and/or stabilization, the use of fictitious "trade association" names, and agreements to not record their meetings and to destroy any record that might be made of them.  In addition, Defendants and their co-conspirators have exchanged emails with false subject lines as codes for conspiracy-related communications, traveled separately to meetings to mask their coordinated activity, and reserved meeting rooms under false names, in order to deceive their victims and avoid detection.  All these efforts – as well as the efforts described in the following paragraphs – were successful in preventing detection by fraudulently concealing the existence of the cartel.

139.    Moreover, Defendants and their co-conspirators have orchestrated and made or undertaken various materially false and fraudulent statements and acts of subterfuge that have been intended to mislead and have misled GE, as described in the following paragraphs, thus successfully concealing the cartel, as has been intended by the Conspirators.

140.    Examples of the Conspirators' fraudulent statements and acts are set forth below.

**Explicit Representations of Non-Collusion**

141.    Embraco and ACC each contracted with GE to supply compressors under one or more Product Sourcing Contracts.  Panasonic contracted with GE to supply compressors under one or more Letter Agreements, with annual amendments on price.  Each delivery of compressors by each supplier was made under a purchase order issued by GE.  In October 1999, GE implemented a set of standard terms and conditions in its purchase orders pursuant to which each supplier made the following representation with respect to each delivery:

> "Supplier represents and warrants that it has not engaged in any
> sharing or exchange of prices, costs, or other competitive
> information or undertaken any other collusive conduct with any
> third party supplier or bidder in connection with the preparation of

44

> any bid or proposal to Buyer or negotiation of this Purchase
> Order."

This provision remained a part of GE's purchase order terms and conditions until at least June 2004 and again from at least September 2007 to the present.

142.    Panasonic, Embraco, and ACC accepted GE's business and purchase order terms – including the explicit representation of non-collusion – at the highest levels of their respective sales organizations, by people who knew of and participated in, and in many cases were instrumental in directing, the cartel.  These individuals included at least the following:  Mike Carpenter, Masatoshi Ando, Hideo Kagita, Keishi Masuda, and Maoki Adachi of Panasonic; Roberto Campos, Ernesto Heinzelmann, Gilberto Heinzelmann, Laércio Hardt, Mario Bazan, Martin Collins, and Bruce Gammie of Embraco; and Josef Oskar, Valter Taranzano, and Dino Turus of ACC.

143.    Panasonic made this non-collusion representation to GE in connection with each purchase order it accepted from GE and with each delivery of compressors it made to GE in each year during at least the time periods 1999-2004 and 2007 to present.

144.    Embraco made this non-collusion representation to GE in connection with each purchase order it accepted from GE and with each delivery of compressors it made to GE in each year during at least the time periods 2002-2004 and 2007 to present.

145.    ACC made this representation to GE in connection with each purchase order it accepted from GE and with each delivery of compressors it made to GE in each year during at least the time periods 1999-2002.

146.    Each representation and warranty of non-collusion made by each of these Conspirators was materially false, fraudulent, and misleading, as in fact each Conspirator was engaged in sharing and exchanging prices, costs, or other competitive information, and

undertaking collusive conduct, with the other Conspirators during the periods covered by their non-collusion representations. These false and fraudulent statements, made in explicit contravention of affirmative representations of non-collusion, were intended to and did mislead GE by inducing GE to believe it was paying prices set in a competitive marketplace free of collusion, and by fraudulently concealing the existence of the Conspirators' illegal cartel. These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

147. The Conspirators also have made false and misleading representations about the confidentiality of their pricing information during the course of their dealings with GE personnel. For example, on May 19, 2005, Mario Bazan of Embraco sent an email to Andrew Drawe and Tonya Williams of GE telling GE that Embraco expected GE to keep Embraco's prices to GE confidential. Mr. Bazan claimed that Embraco treated its prices as confidential information that was not to be shared by GE with Embraco's competitors. He also told GE that Embraco did not share prices being charged to GE or other confidential information about GE with anyone else. Mr. Bazan's statements were materially false and misleading. Embraco regularly exchanged pricing information and other information about GE with the other Conspirators, who were Embraco's competitors. Mr. Bazan knew of the cartel and knew when he made them that his statements were false and materially misleading. Likewise, his superiors at Embraco who approved of and directed his communication to GE knew of the cartel and knew that his statements were false and materially misleading. Mr. Bazan's statements – and similar false statements by other Conspirators' representatives in other interactions with GE personnel – were intended to and did mislead GE by inducing GE to believe it was paying prices set in a

46

competitive marketplace free of collusion.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

**Announcing Higher Price Increases Than the Actual Target**
**Increases, as Agreed Upon by the Cartel**

148.    Defendants and their co-conspirators also have actively and fraudulently concealed the existence of the unlawful contract, combination, or conspiracy alleged herein by agreeing that they would engage in an elaborate charade to fool their customers into believing that they were negotiating prices in a competitive market.  The first step in the charade was that cartel members "announced" to their customers a range of percentage price increases that was higher than the lower, secret range of price increases to which the Conspirators had agreed.  The second step was that the cartel members would then appear to "negotiate" the announced price increases with these customers.  The third step was that the cartel members would pretend that the customers had succeeded in the negotiations by convincing the cartel members to "accept" smaller price increases, which were in fact in the range of price increases the cartel members actually had agreed to impose.  The intent and result of this charade was to fraudulently conceal the cartel and its price fixing.

149.    Pursuant to this agreed charade, Panasonic and Embraco repeatedly have announced very high price increases, but ultimately "accepted" the somewhat lower price increases that were the actual targets agreed by the Conspirators.  This has been a plan orchestrated by the Conspirators to use repeated fraudulent misrepresentations as a way to conceal the existence of the cartel.

150.    For example, at their meeting in Nuremberg, Germany, on October 14, 2004, the Conspirators agreed to announce large price increases for 2005 with the intent of achieving, after "negotiation," a smaller price increase above a certain floor.  The Defendants took this approach

with GE.  Following the script of the cartel charade, on December 3, 2004, Mike Carpenter of

Panasonic announced price increases to Tonya Williams of GE for 2005 that were

approximately, on average, 11% greater than the 2004 prices.  After further "negotiations,"

Panasonic "agreed" to a somewhat lower price increase, as reflected in correspondence dated

February 3, 2005, from Mr. Carpenter to Ms. Williams.  Throughout the time he was having

these price "discussions" with GE, Mr. Carpenter was implementing on behalf of Panasonic, and

knew that he was implementing, a cartel strategy to conceal the cartel by announcing high price

increases and leading GE to believe that it had successfully negotiated down those price

increases.  Likewise, Mr. Carpenter's supervisors at Panasonic who directed him to engage in

this charade with GE knew of the cartel and this planned scheme to fraudulently conceal and

cover up the cartel and mislead GE into believing that compressor prices were the result of

meaningful negotiations in a competitive marketplace, rather than – as was the fact – being the

result of illegal collusion among Panasonic and the other Conspirators.

151.  Similar examples followed:

(a)  Following the same script, on June 1, 2004, Mario Bazan of Embraco

"informed" Robert Braggs of GE that its price increase would be 9%.  Once again, after

engaging in mock "negotiations" with GE, Mr. Bazan ultimately "agreed" to a somewhat

lower price increase.

(b)  Similarly, on May 23, 2006, Mario Bazan of Embraco met with Tonya

Williams of GE and told her that Embraco was raising its prices by 14%, but that

Embraco was willing to give a "discount" to GE.  Eventually, Embraco reduced its price

increase – to the levels agreed by the Conspirators – after the mock "negotiations" with

GE.

48

(c)     On May 30, 2006, Mike Carpenter of Panasonic met with Tonya Williams of GE and informed her that Panasonic would be increasing prices by 14.3%.  Over the coming months, during which Mr. Carpenter led GE through fake "negotiations," Panasonic "agreed" to a somewhat reduced price increase.

152.    The materially false and misleading statements by Embraco and Panasonic – indeed, the entire course of the charade of "negotiating" prices – were intended to and did mislead GE into believing it was negotiating competitive prices in a competitive supply market, and thereby served to fraudulently conceal the existence of the cartel.  The individuals from Embraco and Panasonic who conducted the sham "negotiations" – as well as their supervisors who directed them to conduct the fake "negotiations" – knew that both the announced price increases, as well as the final slightly lower price increases resulting from the "negotiations," were set by illegal agreement of the Conspirators, and that the sham "negotiations" were a charade which was intended to and did fraudulently conceal the existence of the cartel.

**False Representations of the Cause of Increased and Stabilized Prices**

153.    The Defendants and their co-conspirators also have made false statements to GE about the ostensible causes of their pricing, blaming market forces beyond their control as the cause of price increases when in fact the Defendants and their co-conspirators have increased prices because they had so agreed.  They have made their false statements and defrauded GE with the intent and effect of concealing from GE the cartel and its price fixing agreement, which have been the real cause of the increases and stabilization in price.  These false statements have been intended to and did fraudulently conceal the existence of the cartel.

154.    Beginning in approximately late 2003 or early 2004, the cartel faced two new challenges.  First, demand for compressors was beginning to decline, after several years of strong

demand. In a competitive market, softening demand would tend to result in suppliers lowering their prices, and therefore in customers like GE paying lower prices for compressors.

155. This declining demand compounded the second challenge: at the same time that demand was decreasing, the costs of the raw materials used to manufacture compressors began to increase. In a competitive market, in the face of rising material costs one or more of the competing manufacturers would try to increase its business by absorbing some or all of the cost increase, thereby offering lower prices than the other suppliers. The other suppliers would be forced to choose between losing business or lowering their own prices by the same or greater amounts. This strategy would have been particularly effective in the compressor market in the United States, because a compressor manufacturer could lock in a long-term supply agreement with GE by absorbing some of the increased costs in the prices it offered during GE's annual negotiations with its suppliers, gaining an increase in GE's business over the entire year being negotiated.

156. The Conspirators met this challenge in the same way they met every possibility that any real competition would emerge in the compressors market: by agreeing not to compete, and particularly not to compete on price. Specifically, at meetings and in telephone conversations over the following four or more years, the Conspirators agreed on, implemented, and policed a multi-part illegal strategy for dealing with the two new challenges they faced. First, they agreed they would not compete on price by absorbing some or all of the increases in cost they faced, but instead that they would increase prices to GE and other customers to pass through the cost increases. Second, they agreed they would hide the fact that they had *agreed* to pass through the rising costs by instead claiming that they were "*forced*" to increase prices, as if the price increases they were imposing were beyond their control. Third, they agreed they would

specifically refuse to lower their prices in return for getting a larger share of GE's business, or the business of other manufacturers.

157. The following paragraphs provide further details about examples of these illegal agreements and acts.

158. On April 24, 2004, Ernesto Heinzelmann, President and CEO of Embraco, sent a letter to Robert Braggs of GE, announcing a price increase and claiming that the increase was caused by the increased costs of raw and finished materials used to manufacture compressors. This was an intentionally and materially false statement that was designed to conceal the existence of the cartel and was designed to and did mislead GE into believing that compressor price increases were caused by market forces beyond the control of the Conspirators, when in reality the price increases were caused by the illegal agreement among the Conspirators to raise prices to their customers, including GE, rather than to compete with each other for GE's business, including on price. Further perfecting the fraud he was helping to perpetrate, Mr. Heinzelmann also wrote to Mr. Braggs that: "Building on mutual trust and integrity, Embraco's intention continues to remain transparent as we interface with each point of contact within your organization." The statements by Mr. Heinzelmann were materially false and misleading. These statements were particularly egregious fraudulent misrepresentations, citing "trust" and "integrity" while perpetrating a fraud and engaging in a criminal price-fixing cartel. And these statements were effective in fraudulently concealing the existence of the cartel. Far from acting transparently, Embraco and Mr. Heinzelmann intended to and did conceal their dishonest business activities from GE, and induce GE to believe, incorrectly, that Embraco and Mr. Heinzelmann were dealing with it openly, honestly, and transparently. Mr. Heinzelmann not only knew of the cartel when he wrote these lies, but also he was one of the key architects of and

participants in the cartel.  Criminal proceedings for violations of the U.S. antitrust laws are currently pending against Mr. Heinzelmann.

159.    GE attempted to resist the price increase announced by Embraco on April 24, 2004.  But Embraco responded by threatening to cut off GE's supply, an action that – as Embraco well knew – would have had disastrous consequences for GE's business, because GE could not replace the Embraco supply in the near term, and indeed not for many months if at all.  In the course of the negotiations over the price increase, Mario Bazan of Embraco NA wrote emails to Robert Braggs of GE on July 28, 2004, in which he said the price increase was caused by a combination of a shortage of compressor supply in the industry, limited availability of raw materials, chaotic logistics in the Brazilian ports from which Embraco shipped compressors, slowdown in the operations of Brazilian customs, and other market variables beyond the control of Embraco.  The statements were intentionally and materially false and misleading, as the real cause of the price increase was the illegal agreement among the Conspirators to increase prices to their customers, including GE, instead of competing for GE's business, including on price.  Mr. Bazan knew of the cartel when he wrote the July 28, 2004 statements, and knew that his statements were materially false and that they were intended to and did fraudulently conceal the existence of the cartel, as did his superiors at Embraco who instructed Mr. Bazan to impose the price increase on GE and to claim falsely as the causes the lies set forth in his July 28, 2004 emails.  These false statements were intended to and did mislead GE and thereby served to fraudulently conceal the existence of the cartel.

160.    On August 4, 2004, Mr. Bazan of Embraco met in Louisville, Kentucky, with representatives of GE, including Robert Braggs.  Mr. Bazan once again – and falsely – told GE that price increases were caused by market forces beyond Embraco's control, namely increased

raw material costs, particularly steel and to a lesser extent copper.  Mr. Bazan once again – and falsely – also told GE that reduced availability of raw materials, particularly steel and iron products, was expected in 2005.  Mr. Bazan said that because of this reduced availability of raw materials, Embraco would be reducing its production in 2005.  These statements by Mr. Bazan were materially false and misleading, as the real cause of the price increases and the production reduction was an illegal agreement among the Conspirators to implement this cartel activity, including reducing supply to increase prices, instead of competing for GE's business by reducing price and offering the volume needed by GE.  In the absence of a cartel, the prices quoted to GE would have been lower, even in a situation of increased raw material costs, because compressor suppliers would have competed by absorbing some or all of their increases in such costs.  Mr. Bazan knew of the cartel and knew at the time he made his statements to GE that those statements were false and materially misleading.  Likewise, his superiors at Embraco who instructed him as to what he should say to GE knew of the cartel and knew that the statements they instructed Mr. Bazan to make to GE on August 4, 2004, were false and materially misleading.  These false statements were intended to, and did, mislead GE and thereby served to fraudulently conceal the existence of the cartel.

161.   On May 15, 2006, Ernesto Heinzelmann of Embraco wrote a letter to Tonya Williams of GE announcing a price increase, and claiming that the increase was caused by market forces beyond Embraco's control, that is, increases in the costs of base metals used in compressors, particularly copper.  With respect to Embraco's price increase, Mr. Heinzelmann assured Ms. Williams that Embraco had "been taking all possible measures to minimize these increases to date."  Mr. Heinzelmann's statements were intentionally and materially false and misleading and were intended to and did mislead GE, as the real cause of the price increase was

53

the illegal agreement of the Conspirators that they would raise prices, rather than compete on price for GE's business.  In the absence of a cartel agreement, Embraco would not have increased the price to GE, or at least not to the extent it did, because Embraco would have competed for GE's business by absorbing some or all of the cost increases.  Far from "taking all possible measures to minimize these increases to date" as Mr. Heinzelmann claimed in his letter, Embraco had been doing the exact opposite, as it had agreed with its co-conspirators, namely taking all possible measures, all of them illegal, to maximize the price increases.  Mr. Heinzelmann knew of the cartel and knew at the time he made them that his statements were false and materially misleading.  Likewise, Mr. Heinzelmann's superiors at Embraco who instructed him as to what he should say to GE knew of the cartel and knew that the statements they instructed Mr. Heinzelmann to make were false and materially misleading.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

162.    On May 23, 2006, Mario Bazan of Embraco met in Louisville, Kentucky, with representatives of GE, including Tonya Williams.  Mr. Bazan claimed two causes of the price increases:  he claimed that the 2006 price increase was caused by an increase in copper prices; he also claimed that a price increase was "required" to compensate Embraco for heavy losses that Embraco had incurred so far because of rising raw material costs.  Both these statements claimed that market forces beyond Embraco's control caused Embraco to increase its prices.  These statements by Embraco were intentionally and materially false and were intended to and did conceal the cartel and were also intended to and did mislead GE, as the real cause of the price increase was the illegal agreement among the Conspirators to increase their prices to customers, including GE, rather than compete on price for GE's business.  In a competitive market,

Embraco would have absorbed some or all of any raw material cost increases in order to compete for GE's business.  Mr. Bazan knew of the cartel and knew at the time he made them that his statements were materially false and misleading, and that the real cause of the price increase was the agreement of the Conspirators to raise prices rather than to compete on price.  Likewise, his superiors at Embraco who directed him to make these remarks to GE knew of the cartel and knew that Mr. Bazan's "explanation" of the causes of the price increase to GE was materially false and misleading, and that the real cause of the price increase was the agreement of the Conspirators to raise prices rather than to compete on price.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

163.    On May 30, 2006, Mike Carpenter and Jerry Coriano of Panasonic met with Tonya Williams of GE.  They told her that Panasonic's price increase was caused by market forces beyond Panasonic's control, namely rising material costs, particularly of copper.  This was a materially false and misleading statement, as the real cause of the price increase was the illegal cartel agreement of the Conspirators that they would raise their prices to GE rather than compete with each other for GE's business on the basis of lower prices or smaller increases.  (In the absence of a cartel agreement, Panasonic would have absorbed some or all of any raw material cost increase in order to compete for GE's business.)  Messrs. Carpenter and Coriano knew of the cartel and knew that their statements at the meeting with GE were materially false and misleading.  Likewise, their superiors at Panasonic who directed them to make the statements to GE knew of the cartel and knew that the statements being made to GE were materially false and misleading.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

164.    On July 8, 2006, Mike Carpenter of Panasonic sent an email to Tonya Williams of GE citing to a report about increasing copper prices.  He urged Ms. Williams to lock in Panasonic's then-currently-announced price increase before Panasonic was "forced" by rising copper prices – a market force beyond Panasonic's control – to increase it further. Mr. Carpenter's claims were intentionally and materially false, and were intended to conceal the cartel.  His statements were intended to and did mislead GE into believing that Panasonic's price increase was caused by market forces beyond Panasonic's control, while the real cause of the price increase for compressors was the illegal agreement among the Conspirators that they would raise prices to GE rather than compete on price for GE's business.  (In the absence of a cartel agreement, Panasonic would have absorbed some or all of any raw material cost increase in order to compete for GE's business.)  Mr. Carpenter's statement was known by Mr. Carpenter and his superiors to be materially false and misleading.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

165.    On July 13, 2006, Mike Carpenter of Panasonic wrote an email to Tonya Williams of GE "assuring her" that Panasonic had taken every possible step to minimize the price increase for compressors associated with rising material costs.  This was an intentionally and materially false statement intended to conceal the cartel and which was intended to and did mislead GE into believing both that Panasonic was trying to minimize the effects on GE of market forces and that market forces beyond Panasonic's control were the cause of the price increase.  In fact, Panasonic had taken every possible step – every one of which was illegal – to maximize the price increase for compressors, as it had agreed with its co-conspirators.  And this was the real cause of the price increase:  the illegal agreement among the Conspirators that they would raise prices to GE rather than compete for GE's business, including on price.  (In the

absence of a cartel agreement, Panasonic would have absorbed some or all of any raw material cost increase in order to compete for GE's business.)  The statement was known by Mr. Carpenter and his supervising superiors to be materially false and misleading.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

166.    On August 11, 2006, Mike Carpenter of Panasonic wrote an email to Tonya Williams of GE claiming that a price increase was "necessary" to avoid selling compressors at a loss, that is, that the price increase was caused by market forces beyond Panasonic's control.  He again "assured" Ms. Williams that Panasonic had done everything it could to minimize the impact on GE.  These were intentionally and materially false statements intended to conceal the cartel, and which were intended to and did mislead GE:  the real cause of Panasonic's price increase was the illegal agreement among the Conspirators that they would increase prices to GE, rather than compete for GE's business, including on price, and Panasonic had done everything it could – all of it illegal – to maximize the impact on GE.  Mr. Carpenter and his supervising superiors knew that these statements to GE were false and misleading.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

167.    On July 30, 2007, Martin Collins of Embraco sent Tonya Williams of GE an email stating that Embraco intended to increase prices and claiming the increase was caused by then-current macroeconomic conditions, that is, caused by market forces beyond Embraco's control.  This statement of the cause of the price increase was intentionally and materially false, was intended to conceal the cartel and was intended to and did mislead GE, as the real cause of the Embraco price increase was the illegal agreement among the Conspirators to raise prices to

GE rather than to compete for GE's business, including on price.  Mr. Collins knew of the cartel and knew at the time he made it that his statement was materially false and misleading. Likewise, his superiors who directed him to make the statement to GE knew of the cartel and knew that the statement being made to GE was materially false and misleading.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

168.    On May 13, 2008, Mike Carpenter of Panasonic met with Tonya Williams of GE in Louisville, Kentucky.  Mr. Carpenter told Ms. Williams that Panasonic intended to make double digit price increases, claiming as the cause that Panasonic was facing pressure with currency exchange rates and steel and copper prices, that is, that market pressures beyond its control were the cause of Panasonic's price increase.  This was an intentionally and materially false statement intended to conceal the cartel, and which was intended to and did mislead GE, as the real cause of the price increase was the illegal agreement among the Conspirators to raise prices to GE rather than to compete for GE's business, including on price.  In the absence of a cartel agreement, Panasonic would have absorbed some or all of any cost increases associated with raw materials or currency exchange rates, in order to compete for GE's business. Mr. Carpenter knew of the cartel and knew at the time he made them that his statements were materially false and misleading.  Likewise, his supervisors at Panasonic who directed him to make the representations to GE knew of the cartel and knew at the time he made them that his statements were materially false and misleading.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

169.    On September 25, 2008, Josef Oskar of ACC sent an email to Tonya Williams of GE, submitting a high price quote for compressors.  He blamed the high price he quoted on

58

currency exchange rates, and on market prices of copper, electric steel, and hot rolled steel, that is, on market forces beyond the control of ACC.  These were intentionally false statements intended to conceal the cartel and which were intended to and did mislead GE, as the real cause of the high prices quoted was the illegal agreement among the Conspirators.  What ACC was doing was the exact opposite of competing:  instead of offering a low price to win GE's business away from Panasonic and Embraco, ACC was offering a supra-competitive high price – as agreed among the Conspirators – in order *not* to compete with Panasonic and Embraco, that is, *not* to take away any GE business with from Panasonic and Embraco, thus protecting their positions as GE's compressor suppliers.  Mr. Oskar knew of the cartel and knew when he made the statements to GE that they were materially false and misleading.  Likewise, his supervisors who directed him to make the price quote and statements to GE knew of the cartel and knew that Mr. Oskar's statements were materially false and misleading.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

170.   On October 5, 2008, Martin Collins of Embraco emailed a price offer for 2009 to Tonya Williams of GE.  He claimed that the price reflected in the email was caused by market forces beyond the control of Embraco.  This was an intentionally false statement intended to conceal the cartel, and which was intended to and did mislead GE, as the real cause of the price increase was the illegal agreement among the Conspirators to raise prices to GE, rather than to compete for GE's business, including on price.  The statement was known by Mr. Collins and his supervising superiors to be materially false and misleading.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

171.   On November 5, 2008, Mike Carpenter and Jerry Coriano of Panasonic discussed with Tonya Williams of GE an upcoming Panasonic price increase.  They told her that prices

59

were going up because of a shortage of steel supply, that is, that the price increase was caused by market forces beyond Panasonic's control.  This was an intentionally and materially false statement intended to conceal the cartel, and which was intended to and did mislead GE, as the real cause of the price increase was the illegal agreement among the Conspirators to raise prices to GE rather than to compete for GE's business, including on price.  In the absence of a cartel agreement, Panasonic would have absorbed some or all of any cost increases, in order to compete for GE's business.  The statements were known by Messrs. Carpenter and Coriano and their supervising superiors to be materially false and misleading.  These materially false and misleading statements were intended to and did fraudulently conceal the existence of the cartel.

**The Cartel-Orchestrated Cover-Up Role of Tecumseh**

172.     In response to the 2004 price increases from Embraco and Panasonic, GE sought to increase competition in its supply chain by pursuing Tecumseh for a bid and encouraged Tecumseh to get qualified to do business with GE.  Tecumseh said that it agreed to do so, but that promise was a subterfuge.  Tecumseh's real intention, as the cartel had planned, was to lure GE into thinking that Tecumseh might be a potential replacement for, and therefore a competitive alternative for GE to, Panasonic and/or Embraco; this was the first step of the plan. The next step of the cartel's plan was that after the qualification of Tecumseh had been completed, Tecumseh would raise its compressor price to a non-competitive level.  In this manner, Tecumseh would accomplish two important goals of the cartel:  First, it would help to fraudulently conceal the existence of the cartel by presenting to GE the charade of a competitive supply market.  Second, it would protect the Conspirators' illegal agreement on market stabilization and customer allocation, namely that Panasonic and Embraco share the GE business.  This was the plan orchestrated – illegally and successfully – by the Conspirators.

173.   In accordance with the Conspirators' plan, on November 9, 2004, Tecumseh submitted a low, and therefore attractive, price quote to GE with the supposed intention of securing a position in the GE qualification process.  The November 9, 2004 price quote was submitted by Jeffery Salisbury of TdB USA in a letter to Tonya Williams of GE.  Mr. Salisbury told Ms. Williams that it was Tecumseh's intention to gain at least a portion of GE's compressor business.  This was an intentionally and materially false statement for the reason set forth above. Based on the false statements by Mr. Salisbury and the low price quote, GE was misled into believing the compressor suppliers were competing, and therefore began the process of qualifying Tecumseh compressors for use in GE refrigerators.

174.   The qualification process for Tecumseh was unusually lengthy, because Tecumseh repeatedly failed qualification tests and also repeatedly failed to proactively address the issues that caused those qualification failures.  Tecumseh's conduct was designed to execute the cartel strategy:  Tecumseh gave the appearance of trying to qualify its compressors while making no real progress towards actually qualifying them.

175.   During the course of the qualification process, Tecumseh made several more misrepresentations as to its intentions.  On July 5, 2005, Jeff Prunty of TdB USA sent a letter to Tonya Williams at GE, with a low price quote intended to mislead GE into continuing to pursue qualification of Tecumseh as a possible replacement for Panasonic and/or Embraco.  Mr. Prunty's letter said that Tecumseh looked forward to gaining at least a portion of GE's compressor business.  This was an intentionally and materially false statement, as Tecumseh had no intention of replacing Panasonic or Embraco.  Based on the false statements by Mr. Salisbury, including the low price quote, GE was misled into believing that Tecumseh would compete for

GE business, and therefore into continuing the process of trying to qualify Tecumseh compressors for use in GE refrigerators.

176.    On September 23, 2005, Jeff Prunty of TdB USA submitted another low price quote to GE.  He once again told Tonya Williams of GE that Tecumseh looked forward to participating in GE's future requested volumes of compressors.  This statement was intentionally and materially false, as Tecumseh had no intention of supplying compressors to GE.  Based on the false statements by Mr. Salisbury, including the low price quote, GE was misled into believing that the cartel members were competing, that Tecumseh intended to compete for GE business, and therefore into continuing the process of trying to qualify Tecumseh compressors for use in GE refrigerators.

177.    On November 17, 2005, Jeff Prunty of TdB USA sent a letter to Tonya Williams of GE again submitting low price quotes and informing GE that Tecumseh was "serious about becoming a viable source for GE."  Both the price quote and the statement of intent were intentionally and materially false statements, as Tecumseh had no intention of competing for GE's business at all, much less "seriously."  In response to this statement and the price quote, and in the mistaken belief that Tecumseh would soon be qualified and would actually compete for its business, GE was misled into continuing the process of qualifying Tecumseh compressors for use in GE refrigerators, and began planning the transition of a portion of its compressor purchases to Tecumseh.

178.    On September 25, 2007, Sandro Ferreira and Jeffrey Salisbury of Tecumseh sent a letter to Tonya Williams of GE, again submitting a low quote to GE and once again intending to make GE believe that Tecumseh was interested in selling compressors to GE after it had qualified with GE.  In that letter, Messrs. Ferreira and Salisbury stated that Tecumseh was

willing to start supplying GE.  The price quote and the statement of intent were both intentionally and materially false statements intended to conceal the cartel and mislead GE, as Tecumseh had no intention of selling compressors to GE.  Based on the letter and price quote, GE was misled into believing the cartel members were competing and was further misled into continuing the process of qualifying Tecumseh compressors for use in GE refrigerators.

179.    Messrs. Salisbury, Prunty, and Ferreira knew of the cartel at the time they quoted prices and made the statements of intent to GE set forth above.  Messrs. Salisbury, Prunty, and Ferreira knew that their statements were materially false and misleading.  Likewise, their supervisors at Tecumseh, who directed them to submit the price quotes and make the statements to GE, knew of the cartel and knew the statements made by Messrs. Salisbury, Prunty, and Ferreira to GE were materially false and misleading.  The false statements of intent and the false price quotes, as well as Tecumseh's false premise of future competition, were intended to and did fraudulently conceal the existence of the cartel.  Based on the false statements by Messrs. Salisbury, Prunty, and Ferreira, the false low price quotes, and the other actions of Tecumseh described above, GE was misled into believing the cartel members were competing, believing that Tecumseh intended to compete for GE business, and continuing the process of trying to qualify Tecumseh compressors for use in GE refrigerators.  In 2008, Tecumseh finally qualified compressors that GE could use in GE refrigerators.

180.    On September 29, 2008 – shortly after Tecumseh finally qualified to supply GE – Jeff Salisbury and Sandro Ferreira of Tecumseh submitted a price quote to Tonya Williams of GE, ostensibly to solicit GE business for 2009.  This time the quoted prices were considerably *higher* than those previously quoted by Tecumseh, and were not competitive with prices then being offered by Embraco and Panasonic for similar compressors.  This was consistent with the

Conspirators' plan, which always had been to raise Tecumseh's price after qualification, to avoid competing against Panasonic and Embraco for GE's business, and thereby protect Panasonic's and Embraco's hold on the GE business. That GE was in fact misled, as Tecumseh and the other Conspirators intended, is demonstrated by the fact that GE continued in good faith the four-plus-year-long process of trying to qualify Tecumseh compressors. During these four-plus years that it was play-acting at the qualification process, Tecumseh was spending time and effort to *not* qualify its compressors, as a portion of its investment in the conspiracy, and playing its part in the fraudulent concealment of the conspiracy.

**Embraco's False Assurance of No Cartel Harm to GE**

181.   On February 18, 2009, Bruce Gammie of Embraco sent an email to Tonya Williams, Adam Kennedy, Rory Gillman, and José Lopez of GE attaching a letter of the same date from Ernesto Heinzelmann and Laércio Hardt of Embraco. The letter informed GE that on February 17, Embraco "became part of an international investigation related to the business practices in the refrigeration compressor industry." This vague statement did not mention a cartel or any investigation relating to possible violations of the antitrust or other competition laws in the United States or elsewhere. Nor did it mention that the products under investigation were refrigerant compressors for *household* refrigerators, exactly the products Embraco was selling to GE, or that GE had been repeatedly named by the Conspirators as a specific target of the illegal cartel. The vague announcement could have related to any of a vast number of business practices, from shoddy materials to unfair labor practices to bribery, and to any of a large variety of compressor types, for either household or commercial applications.

182.   The letter further stated: "If other significant information becomes available you will be contacted by ourselves or your Embraco sales representative." This was an intentionally and materially false statement intended to conceal the existence of the cartel and its impact on

GE, and to mislead GE into believing both that the focus of the investigation was not relevant to the Embraco-GE business relationship, and to further mislead GE into believing that Embraco was being and would continue to be "transparent" in its dealings with GE. Neither Embraco nor Messrs. Heinzelmann, Hardt, or Gammie had any intention of providing information about the cartel to GE, and in fact they never did so. The purpose of their fraudulent statement was to give the false assurance to GE that if information relevant to GE became available, Embraco would tell GE; that is, it was intended to communicate to GE that GE had no reason to be concerned *unless* Embraco came back to GE with further information. The statement was made in furtherance of the cover-up of the cartel, as it was intended to prevent GE from investigating the cartel. Messrs. Heinzelmann, Hardt, and Gammie knew the statement was materially false and misleading, and so did their supervising superiors who directed that the letter be sent to GE. Thus, even this ostensible "disclosure" was an integral part of the Conspirators' ongoing and successful fraudulent concealment of the cartel's existence.

**The 2009 Embraco Price Negotiations**

183. In 2009 – *after* the February announcements of government investigations – GE noted a then-recent decline in raw material prices and approached Embraco about decreasing its prices. GE's approach was based on Embraco's repeated assurances over the previous five years that Embraco's price increases over that time had been "caused" by increases in raw material prices. That is, believing Embraco's repeated fraudulent representations that Embraco's price increases had been caused by market forces beyond Embraco's control, GE believed that when those same market forces moved in GE's favor – a decline in raw material prices – Embraco's prices to GE should and would also decline. Embraco claimed to agree to discuss decreasing its prices to a limited extent, supposedly as a means of obtaining more business with GE. During the course of the subsequent discussion that followed in 2009, Embraco repeatedly made

statements that its historical price increases prior to 2009 had been caused by increases in raw material costs.

184.    The statements made in 2009 by Embraco were intentionally and materially false and were intended to and did conceal the existence of the cartel, and were intended to and did mislead GE, as the real cause of the price increases had been and continued to be the illegal agreement among the Conspirators to raise prices to GE rather than to compete for GE's business, including on price.  In the absence of a cartel agreement, Embraco would not have increased its prices to the extent it did and would instead have absorbed some or all of any increase in raw material costs to compete for GE's business.

185.    Not once during the negotiations in 2009 – even after it had sent the letter revealing an investigation, and even after it again promised complete transparency and to provide additional information on the cartel investigation – did Embraco reveal the existence of the cartel or disclose that GE had been a main target of the cartel.  Nor did Embraco reveal the impact of the cartel on the prices charged to GE.  Instead, even after promising in its February 18 letter to tell GE all relevant information about the conduct that was under investigation, Embraco instead continued serving up lies in order to continue the cartel's cover-up, its successful fraudulent concealment of its existence.

186.    For example, the following intentionally and materially false and misleading statements were made by Embraco:

(a)    On August 5, 2009, Martin Collins of Embraco NA sent an email to Tonya Williams, Adam Kennedy, and Rory Gillman of GE telling GE that the rising cost of steel and copper from 2007 to 2009 and Embraco's inadequate hedging position on raw materials caused the prices charged to GE.  This was an intentionally and materially false

statement, which was intended to conceal the cartel actions and effects by stating that the price increases were caused by forces beyond Embraco's control, and which also was intended to and did mislead GE, as the real cause of the increase in compressor prices was the cartel agreement of the Conspirators to raise prices to GE rather than to compete for GE's business, including on price. In the absence of a cartel agreement, Embraco would have absorbed some or all of any raw material or hedging cost increases in order to compete for GE's business.

(b)     On August 6, 2009, Martin Collins of Embraco NA sent an email to Tonya Williams, Adam Kennedy, and Rory Gillman of GE telling GE that prior price increases on compressors were caused by increased cost of raw materials, that is, by forces beyond Embraco's control. This was an intentionally and materially false statement that was intended to and did mislead GE, and fraudulently conceal the existence, the actions, and the effects of the cartel and to protect the supra-competitive prices achieved by the cartel.

(c)     On August 14, 2009, Martin Collins of Embraco NA sent an email to Tonya Williams, Adam Kennedy, and Rory Gillman of GE telling GE that Embraco's past price increases had been fair and were caused by increases in raw material costs, that is, by forces beyond Embraco's control. This was an intentionally and materially false statement that was intended to and did fraudulently mislead GE, and to hide the existence of the cartel and its effect on the prices paid by GE. Mr. Collins also said that a further reduction of 2009 prices could not be made, given the past raw material cost increases. This, too, was an intentionally and materially false statement that was intended to and did mislead GE, and to fraudulently conceal the existence of the cartel and shield its supra-competitive prices from erosion.

(d)     On August 19, 2009, Roberto Campos of Embraco sent an email to Richard Simpson of GE telling GE that Embraco had not held back any information about its past pricing and the cause of it.  This statement was intentionally and materially false and was intended to and did mislead GE, as Embraco in fact had held back – and continued to hold back – from GE the most important information, namely that its pricing to GE had been and was caused by the illegal cartel agreement in which Embraco was a key player, and the resulting lack of competition, facts which Embraco fraudulently concealed with its materially false and misleading statements.

187.    At the time that Messrs. Collins and Campos made the statements to GE set forth above, they knew of the cartel and knew that their statements were materially false and misleading.  Likewise, their supervisors at Embraco who directed Messrs. Collins and Campos to negotiate with GE and make the statements about past pricing that they did, knew of the cartel and knew that the statements being made to GE by Messrs. Collins and Campos were materially false and misleading.  These misleading statements were intended to and did fraudulently conceal the existence, the actions, and the effects on GE of the cartel.

**GE Did Not Know of the Cartel**

188.    Because of the repeated intentionally and materially false and misleading statements of the Conspirators as set forth in paragraphs 137-187 above, and their successful fraudulent concealment of the cartel, GE was unaware of the Defendants' cartel.  GE did not suspect that it was a victim of a cartel.

189.    As early as 1999, GE diligently attempted to protect itself against collusion among its suppliers by insisting that its suppliers explicitly represent that they had not engaged in collusion, and by insisting that its suppliers make that explicit representation in connection with each purchase order and again with each delivery.

68

190.    When the Defendants and their co-conspirators attempted to impose price increases on it, GE was diligent in its response to the price increases being demanded.  GE questioned its suppliers about the causes of the increases, GE researched the justifications offered by the suppliers, such as raw material cost increases, and GE negotiated vigorously with its suppliers in an attempt to avoid or reduce cost increases and avoid supply shortages.  Those efforts never revealed any reason to suspect a cartel, as the suppliers, by agreement, played out their charade of feigned price competition and sham negotiations, and continued to offer false and misleading causes of their pricing, fraudulently misrepresenting it as based on market forces beyond their control.

191.    When the Defendants said that the price increases they demanded were caused by increases in raw material prices and forces beyond their control, GE performed its own research, which indicated that there had in fact been increases in raw material prices.  For example, in evaluating the demand of Embraco and Panasonic for a price increase for 2005, Tonya Williams researched the matter in late 2004, confirmed that raw material prices were increasing, and put her findings in a January 2005 report to her management.  Her analysis did not reveal a reason to suspect a cartel.  GE did not know that the Defendants were using rising raw material costs, and the fake "negotiations" it carried on with GE, to mask the fact that the price increases they imposed on GE resulted from an illegal agreement among them to raise prices, and not from the effects in a competitive market of an increase in the cost of raw materials.

192.    GE also took other steps to attempt to ensure that there was competition among the compressor manufacturers and that it was receiving fair bids.  For example, it solicited and received bids from ACC on October 26, 2004, April 24, 2008, September 25, 2008, and December 14, 2008, as a check on the Embraco and Panasonic prices.  GE did not know that

ACC was part of a cartel with Embraco, Panasonic, Tecumseh, and Danfoss, and that its bids were therefore artificially and fraudulently inflated at a level above those of Panasonic and Embraco for the exact purpose of *not* winning any business from GE. GE believed it was conducting a reasonable and useful market-based check to determine whether Panasonic and Embraco were competitively pricing refrigerant compressors to GE, not knowing that all bidders were in an illegal cartel.

193.    GE also reached out to Tecumseh – the largest supplier of compressors in the United States after Embraco and Panasonic – to solicit price quotes from it and to qualify it as a supplier beginning in 2004, as discussed above. This was a reasonable market-based step by GE in an attempt to ensure that it received competitive pricing from its compressor suppliers. GE was not aware that Tecumseh was part of a cartel with Panasonic, Embraco, ACC, and Danfoss. GE believed that Tecumseh's low price quotes and eagerness to be qualified were genuine, and reflected competition in the marketplace. It had no reason to believe that Tecumseh was engaged in subterfuge, satisfying its obligations to the illegal cartel by misleading GE into thinking Tecumseh intended to compete with Panasonic and Embraco, when in fact the Conspirators had agreed that Tecumseh would not compete.

194.    When commodity prices fell, GE raised that issue in the course of its annual negotiations with its suppliers. For example, in early February 2009, GE personnel evaluated January 2009 data for raw material prices, and concluded that raw material prices had declined. Accordingly, on February 10, 2009, Tonya Williams of GE sent an email to Bruce Gammie and Martin Collins of Embraco NA to request price decreases based on falling commodity prices. Embraco pretended to "negotiate" possible price reductions over approximately the next six months, as alleged above; GE did not know these ostensible negotiations were a sham

70

orchestrated by the Conspirators.  This process of analyzing cost data and attempting to negotiate price reductions was a diligent response by GE to the historic price increases by its suppliers. The apparent willingness of suppliers to engage in what appeared to GE to be price negotiation gave GE no reason to believe that it was and had been for more than a decade the victim of a cartel.  In fact, Embraco's "negotiation" was a charade, orchestrated by the Conspirators, mere play-acting intended to mask and conceal the fact that prices were being set by illegal agreement among the Conspirators, by giving GE the false appearance and result of a market-based negotiation – some price decrease – while actually imposing prices in line with those set by the illegal agreement among the Conspirators.

**GE's Inquiry Notice of a Cartel**

195.    Under the controlling precedent in the Sixth Circuit, actions that would deceive a reasonably diligent plaintiff will toll the statute of limitations, provided that the plaintiff does not delay unreasonably in investigating circumstances that put it on notice of a potential claim.  *See Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 447 (6th Cir. 2012).  In the Sixth Circuit, such circumstances trigger the plaintiff's obligation diligently to investigate whether it may have a claim; this date of notice to diligently investigate whether it may have a claim is referred to in this Complaint as the "inquiry notice" date.  *Id.* at 448.

196.    Late February 2009 was the earliest date on which it could be argued that GE was on inquiry notice of the possibility that it was a victim of a cartel; it was the first time there were any indication of a possible cartel that would trigger an awareness of a need to investigate.  By the end of February 2009, it was publicly known – for the first time – that the DOJ had commenced an antitrust investigation concerning the compressor industry.  At about the same time, it was also publicly known that lawsuits had been filed on February 25, 2009, on behalf of a putative class of direct purchasers of compressors, which in one such lawsuit was described as

71

a class of purchasers of hermetic household refrigerant compressors of one horsepower or less, a class that would include GE. On the other hand, GE's suppliers continued to fraudulently conceal the conspiracy long after February 2009, as noted in paragraphs 181-187.

197.   As of March 2009, GE believed that it did not have sufficient information to know if it had a claim or to file a lawsuit and in any event knew that its interests were protected by the fact that it was a member of the putative class for which a complaint had been filed on February 25, 2009. GE relied on the diligence expected of class counsel. GE also started its own diligent investigation in an effort to discover if it had an independent cause of action by monitoring the development of evidence in the class litigation, in the criminal proceedings, and from any other sources of information that might be discovered, such as through ongoing commercial dialogue with Defendants and their co-conspirators about their supply relationships.

198.   On September 30, 2010, Embraco and Panasonic – GE's two largest suppliers – pled guilty to violating the Sherman Act in the sale of household refrigerator compressors in the United States between 2004 and 2007. GE began a process of choosing outside counsel to help it determine if it had a claim, and in March 2011, GE retained outside counsel to conduct an intensive factual and economic investigation.

199.   In May 2011, GE's outside counsel contacted a participant in the cartel about the possibility of cooperating with GE in the investigation of any claims that GE might have with respect to a cartel in the refrigerant compressor industry. Over the next several months, outside counsel negotiated the terms of a cooperation agreement. On December 1, 2011, one cartel participant (the "First Cooperating Conspirator") agreed to cooperate with GE's investigation and to provide GE's outside counsel with information about the cartel. In December 2011, GE's outside counsel began to receive information from the First Cooperating Conspirator, which

72

GE's outside counsel evaluated, along with other information gathered in the course of its investigation.

200.    The preliminary, pre-suit investigation by outside counsel of the evidence collected from the First Cooperating Conspirator and from GE, including economic analysis of prices paid by GE over time, was completed in February 2012.

**GE's Constructive Notice of a Cartel**

201.    While the date of inquiry notice is the point from which one considers the diligence of the plaintiff's investigation of its possible claim, it is not the date from which the statute of limitations is measured, provided that there has been diligent investigation.  Instead, in the Sixth Circuit, under the doctrine of fraudulent concealment, the period of limitations does not run until the date that the plaintiff actually discovers or should have discovered its claim after diligent investigation from the date of inquiry notice.  *See Norton-Children's Hosps., Inc. v. James E. Smith & Sons, Inc.*, 658 F.2d 440, 443 (6th Cir. 1981).  This date of claim discovery is referred to in this Complaint as the "constructive notice" date, as distinguished from the "inquiry notice" date.

202.    Based on the foregoing careful, methodical, and diligent investigation, GE determined at the end of February 2012 that it had an adequate and good-faith basis for a claim against the Defendants, based on the allegations set forth in this Complaint.  The conclusion of this investigation at the end of February 2012 was the earliest date at which it could be argued that GE had constructive notice of its claim against the Defendants.

203.    In April 2012, GE commenced negotiations with other various Conspirators in an attempt to resolve its claims against them.  Around this same time, counsel for GE engaged in initial discussions with a second cartel participant (the "Second Cooperating Conspirator").  That participant ultimately decided to cooperate with GE, and entered into a cooperation agreement

with GE in June 2012.  In August 2012, the Second Cooperating Conspirator provided GE with additional factual information regarding the cartel, which GE undertook to analyze and place in context with the other information it had already gathered.   The negotiations with other Conspirators continued, but by February 2013, it became clear that GE's claims against them could not be satisfactorily resolved without litigation.

### FIRST CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

204.    Plaintiff re-alleges and incorporates each and every allegation set forth in the paragraphs 1-203 above.

205.    Beginning at least as early as January 1, 1996, and continuing thereafter until at least into 2013, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators have engaged in a continuing contract, combination, and conspiracy to raise, fix, maintain, and stabilize prices of, allocate customers and markets for, restrict supply for, and restrict innovation of refrigerant compressors in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

206.    The contract, combination, and conspiracy alleged herein consisted of a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms of which have been to raise, fix, maintain, and stabilize prices of, to allocate customers and markets for, to restrict supply for, and to restrict innovation in refrigerant compressors sold in the United States and elsewhere.

207.    For the purpose of forming and carrying out the contract, combination, and conspiracy, Defendants and their co-conspirators have done those things that they combined and conspired to do, including, but not limited to, meeting to discuss and agree upon future price stabilization and price increases, customer and market allocation, supply restriction, innovation

74

restriction, and other activities designed to implement and fraudulently conceal the illegal, anticompetitive conspiracy.

208.    Defendants and their co-conspirators have entered into and engaged in a contract, combination, and conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

209.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, and conspiracy have been authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

210.    The anticompetitive activities of Defendants and their co-conspirators have proximately caused injury to Plaintiff in the United States.

211.    As a direct and proximate result of the contract, combination, or conspiracy among Defendants and their co-conspirators alleged in this Complaint, the prices charged to Plaintiff for refrigerant compressors have been unlawfully raised, fixed, maintained, and stabilized in the United States, the supply of compressors has been artificially restricted, and innovation in compressor technology has been artificially restricted, such effects continuing at least through the filing date of this Complaint.

212.    The alleged contract, combination, and conspiracy is a per se violation of the federal antitrust laws.

213.    The contract, combination, and conspiracy has been directed at and targeted import commerce, has been meant to and has produced substantial effects on import commerce, and has had the following direct, substantial and reasonably foreseeable effects upon commerce

in the United States and upon import commerce, such effects continuing at least through the filing date of this Complaint:

>  (a)     Prices for refrigerant compressors sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high and non-competitive levels;

>  (b)     Plaintiff has been deprived of the benefit of free and open competition in the purchase of refrigerant compressors;

>  (c)     Price competition in the sale of refrigerant compressors has been restrained, suppressed, and eliminated; and

>  (d)     Plaintiff has been deprived of the benefit of competition in technology and in innovation in the supply of refrigerant compressors.

214.    As a direct and proximate result of the illegal conspiracy, Plaintiff has paid more for refrigerant compressors in the United States than it would have paid in the absence of the illegal conspiracy, could not obtain the most efficient or technically advanced compressors, and otherwise has been injured in its business or property, and has suffered damages in an amount presently undetermined, but which can be ascertained and established at trial.

## SECOND CAUSE OF ACTION

### Fraud

215.    Plaintiff re-alleges and incorporates each and every allegation set forth in the paragraphs 1-203 above.

216.    As set forth more fully above, the Defendants and their co-conspirators have made repeated and material misrepresentations in their communications with GE.

217.    The Defendants' and their co-conspirators' misrepresentations have been false and misleading, and Defendants and their co-conspirators knew that their misrepresentations were false and misleading.

218.    The Defendants and their co-conspirators have intended, through their false and misleading statements, to induce GE to make purchasing and other business decisions on the basis of such statements.

219.    In making its business decisions, GE has relied on the Defendants' and their co-conspirators' misrepresentations.

220.    As a direct result of Defendants' and their co-conspirators' fraudulent misrepresentations, GE has sustained financial damage.

### THIRD CAUSE OF ACTION

### Conspiracy

221.    Plaintiff re-alleges and incorporates each and every allegation set forth in the paragraphs 1-203 above.

222.    As set forth more fully above, each Defendant has entered into a conspiracy with each other Defendant and each other co-conspirator to fraudulently misrepresent material facts to GE.

223.    Each Defendant and co-conspirator has taken steps in furtherance of the conspiracy, by, among other things, attending meetings or otherwise having communications with co-conspirators in which they agreed to make fraudulent misrepresentations to GE, and then making such fraudulent misrepresentations to GE.

224.    Through these and other actions, each Defendant and co-conspirator has acted in concert with each other Defendant and co-conspirator to perpetrate a fraud against GE.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

A.     A decree that the unlawful contract, combination, or conspiracy alleged herein constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.     Entry of joint and several judgments for Plaintiff against the Defendants for three times the amount of damages sustained by Plaintiff, as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

C.     An award of compensatory and punitive damages to Plaintiff for Defendants' tortious and otherwise illegal conduct;

D.     Entry of an injunction preliminarily and permanently enjoining Defendants from continuing the unlawful contract, combination, and conspiracy alleged herein;

E.     An award of prejudgment interest pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a); and

F.     Such further and other relief as the case may require or as the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of all issues so triable.

Respectfully submitted,

/s/ John R. McCall
John R. McCall
Theresa A. Canaday
FROST BROWN TODD LLC
400 West Market Street, Suite 3200
Louisville, KY  40202
(502) 589-5400
Fax:  (502) 581-1087
jmccall@fbtlaw.com
tcanaday@fbtlaw.com

Jeffrey Blumenfeld
David M. Schnorrenberg
M. Brinkley Tappan
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
(202) 624-2500
Fax:  (202) 628-5116
jblumenfeld@crowell.com
dschnorrenberg@crowell.com
mbtappan@crowell.com

*Counsel for Plaintiff General Electric Company*

Dated:  February 15, 2013

LOULibrary 0000IZR.0603603   1366428v1

79